Bryan THOMPSON, by Next Friend Larry THOMPSON; Marc Shunk, by Next Friend Robert Shunk; Christopher Eakle, by Next Friend Flo Eakle, Plaintiffs,

v.

WAYNESBORO AREA SCHOOL DISTRICT, Defendant.

Civ. A. No. 86–0784.

United States District Court,
M.D. Pennsylvania.

Nov. 24, 1987.

Larry L. Crain and James N. Clymer, Lancaster, Pa., Larry Crain, John W. Whitehead, Manassas, Va. and Larry L. Crain, Ames, Southworth & Crain, Brentwood, Tenn., Timothy Misner, Waynesboro, Pa., for plaintiffs.

Robert G. Hanna, Jr., Frank J. Lavery, Jr., Philadelphia, Pa., for defendant.

## MEMORANDUM

RAMBO, District Judge.

Before the court are motions by both plaintiffs and defendant for summary judgment. The motions have been fully briefed and are ripe for disposition.

*Background*

At the time of the events which form the basis of this action, plaintiffs Bryan Thompson, Marc Shunk, and Christopher Eakle were students at Antietam Junior High School. Antietam is a secondary, public school within the defendant Waynesboro Area School District. On the morning of April 28, 1986, Thompson and Shunk distributed copies of a newspaper entitled *Issues and Answers* in the hallway of Antietam Junior High School before classes began. *Issues and Answers* is published in Illinois by a group known as "Student Action for Christ", and the paper contains articles and cartoons which advocate religious tenets such as a personal relationship with God and an adherence to the principles of the Bible. Thompson's motivation for distributing *Issues and Answers* to his fellow students was "... to lead people to the Lord." Deposition of Bryan Thompson at 9. Shunk's motivation for distributing the paper was to communicate the "Christian viewpoint" to other students. Deposition of Marc Shunk at 8.

One of the recipients of *Issues and Answers* on April 28, 1986 was a teacher at the school who subsequently gave his copy of the paper to the school principal, Robert Mesaros. Mesaros then consulted with Dr. Shelton, the school district superintendent, regarding the paper. Mesaros also had discussions regarding the paper with Bryan Thompson and Thompson's father on April 28, 1986. In his discussion with Thompson's father Mesaros expressed some reservation as to Bryan Thompson's distribution of *Issues and Answers.* Mesaros claimed that there was a school policy which prohibited the distribution of literature until it had been previewed. *See* Deposition of Larry Thompson at 10.

On the following day Mesaros wrote a memorandum to the Thompsons outlining certain restrictions which would be imposed on further distributions of *Issues and Answers.* The memorandum indicated that Bryan would be permitted only to distribute *Issues and Answers* prior to 7:50 a.m. outside the school building, on the sidewalk and parking lot. During the school day Bryan would be required to keep extra issues of the paper in his locker. According to the memorandum, the basis for these restrictions was a policy of defendant whereby prior approval was necessary before materials could be displayed, posted, or distributed on school property and the authority of school officials to "... set forth the time and place of distribution so that distribution does not materially or substantially interfere with the educational process, threatens [sic] immediate harm to the welfare of the school or community, encourages [sic] unlawful activity or interferes [sic] with another individual's rights." Amended Complaint, Exhibit D. In the past defendant generally has prohibited nonstudent groups from distributing in its schools literature which is not sponsored by the schools.

On May 8, 1986 Bryan Thompson, Marc Shunk, and Christopher Eakle again distributed *Issues and Answers* in a hallway of Antietam Junior High School prior to the commencement of classes. A teacher confronted the three boys and instructed them to stop distributing the papers. The three

boys continued to distribute the papers and were shortly thereafter approached by Antietam's assistant principal.[1] The assistant principal escorted Shunk and Thompson to an office, where they were placed on in-class suspension. Later that day, Mesaros advised the boys that they would no longer be permitted to distribute *Issues and Answers* at any time if they continued to disregard the time and place restrictions that defendant had placed on the distribution of the paper.

Nevertheless, Marc Shunk and Bryan Thompson again distributed *Issues and Answers* on May 12, 1986 in a hallway of Antietam Junior High School prior to the commencement of classes. Again they were confronted by a teacher and escorted to Mesaros' office. The boys were placed on in-school suspension for the entire school day. Mesaros wrote to the parents of both boys and informed them that the reason for the suspensions was the boys' "... willful disregard for school district policy and direct disobedience of [Mesaros'] directive...." Amended Complaint, Exhibits E and F. Since May 12, 1986 no further distributions of *Issues and Answers* by plaintiffs have occurred. None of the three distributions described above resulted in any form of disturbance.

In addition to the facts surrounding plaintiffs' distribution of *Issues and Answers,* other facts are relevant to the claims which plaintiffs assert in this action. For instance, students of Antietam Junior High School have the opportunity to participate in noncurriculum activities, such as student clubs, which meet in school during noninstructional time at the end of the school day. One club which students may participate is the Newspaper Club, which publishes a school newspaper entitled *Round–Up.* A faculty member from the English curriculum advises the *Round–Up* staff, which consists entirely of students. The paper is distributed to students during the homeroom period at the beginning of the school day. Included in *Round–Up* are articles, poems, and lists prepared by the students. The school principal supervises the content of *Round–Up* only for the purpose of removing or editing material which is obscene, libelous, or substantially disruptive. *See* Deposition of Mesaros at 45, 46. Another club available to students is the School Decorations Club, which prepares decorations to be placed in the halls and bulletin boards of Antietam Junior High School. Plaintiff's Motion for Summary Judgment, Exhibit J. A club that meets during the after-school activity hour in the high school operated by defendant is the Bible Club. Plaintiffs did not request the opportunity to form a club or to meet during the after-school activity hour.

On June 11, 1986 plaintiffs filed a complaint in this court against the defendant school district and members of the school's board of directors. An amended complaint was filed on February 23, 1987, and the school board members were voluntarily dismissed as defendants. The amended complaint contains the following four causes of action: that in restricting plaintiffs' freedom to distribute *Issues and Answers* defendant violated plaintiffs' rights of free speech and the free exercise of religion as guaranteed by the first amendment to the United States Constitution, that defendant violated the Equal Access Act, 20 U.S.C. §§ 4071–4074, that defendant violated plaintiffs' rights to equal protection as guaranteed by the fourteenth amendment, and that defendant violated plaintiffs' ninth amendment rights as well as rights guaranteed by the Pennsylvania Constitution.

Shortly after filing their amended complaint plaintiffs filed a motion for summary judgment. With their motion plaintiffs filed a supporting brief, an affidavit, excerpts from depositions, various exhibits, and a statement of undisputed, material facts as required by Local Rule 401.4. In response, defendant filed its own motion for summary judgment and also supported its motion with a statement of facts, a

---

1. In plaintiffs' counterstatement of undisputed material facts, they assert they immediately ceased distributing the paper when ordered to do so by the teacher. However, it is apparent from the depositions of Bryan Thompson and Marc Shunk that they continued to distribute the papers. *See* Deposition of Bryan Thompson at 31 and Deposition of Marc Shunk at 13, 14.

supporting brief, deposition transcripts, and other exhibits. It is from the documents supporting the parties' motions that the court derives the facts which are recounted above.

*Discussion*

The court will enter summary judgment only "... if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Normally, doubts as to the existence of a genuine, factual issue must be resolved in favor of the opponent of a summary judgment motion, *Addickes v. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), and inferences to be drawn from the facts of record must be drawn in the light most favorable to the opponent. *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). Because both parties in this case have moved for summary judgment, the court cannot favor one party over another in determining the existence of a genuine issue or in drawing inferences from the facts that are of record. Of necessity, both parties argue that there is no genuine issue of material fact. Yet plaintiffs disagree with some of the factual assertions in defendant's statement of undisputed, material facts. A material fact is one which might affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, ——, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A genuine issue exists "... if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* Upon an examination of the pleadings, affidavits, depositions, and other exhibits, the court concludes that there is no genuine issue of material fact and the disputes between the parties relate solely to the issue of which party is entitled to judgment as a matter of law.

The issues raised by the parties which the court must address in making that determination are as follows: whether the distribution by plaintiffs of a religious newspaper in the hallways of Antietam Junior High School during noninstructional time is conduct which is protected by the Equal Access Act, whether defendant created a public forum at Antietam Junior High School through its policies with respect to student activities, whether the restrictions which defendant placed on plaintiffs' distribution of *Issues and Answers* are constitutionally valid in the context of the forum which exists at Antietam Junior High School, and whether defendant's restrictions infringe unconstitutionally on plaintiffs' right to exercise their religion freely.

### A. Equal Access Act

■ The Equal Access Act provides, in part, that:

> It shall be unlawful for any public secondary school which receives Federal financial assistance and which has a limited open forum to deny equal access or a fair opportunity to, or discriminate against, any students who wish to conduct a meeting within that limited open forum on the basis of the religious, political, philosophical, or other content of the speech at such meetings.

20 U.S.C. § 4071. The Act then defines "limited open forum"[2] and "fair opportunity." It also limits the right of students to equal access with the qualification that the school is not deprived by the Act of its authority "... to maintain order and discipline on school premises, to protect the well-being of students and faculty, and to assure that attendance of students at meetings is voluntary." 20 U.S.C. § 4071(f).

In the case at bar the parties disagree as to whether distributing *Issues and Answers* in the hallways of Antietam is the type of conduct which Congress sought to protect in enacting the Equal Access Act. On its face, the Act obviously guarantees

---

**2.** "A public secondary school has a limited open forum whenever such school grants an offering to or opportunity for one or more noncurricu- lum related student groups to meet on school premises during noninstructional time." 20 U.S.C. § 4071(b).

students of public, secondary schools that they will have the opportunity to conduct *meetings* in school as long as certain conditions are met. The term "meeting" is defined specifically in the Act to include "... those activities of student groups which are permitted under a school's limited open forum and are not directly related to the school curriculum." 20 U.S.C. § 4072(3). Further understanding of the term "meeting" is provided by the report of the Senate Judiciary Committee regarding the Act. The Committee contemplated that the Act would guarantee to students the following opportunity:

> There would be no "religious teacher" supplied by the school. Instead, the students themselves would be able to initiate and direct meetings that include religious expression. Such meetings would be voluntary in the truest sense of the word. In order for any student to attend, it first would be necessary for at least one student to take the initiative and arrange the meeting. Any other student desiring to participate would then have to reject the various other secular activities available to him and go to the room where those few other students who have a common interest would be meeting for religious activities. Indeed, the individual students would be selecting on an individual basis the activities in which they wished to participate.

S.Rep. No. 357, 98th Cong. 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin. News 2348, 2374 (footnote omitted).

From this portion of the Senate report it appears that a major characteristic of the meetings for which the Equal Access Act guarantees an opportunity is the voluntariness of the meetings. The voluntariness of the meetings would be protected by the fact that the meetings would be entirely student initiated. Voluntariness would also be assured by the fact that a place would be set aside where it would be necessary for the student to go in order to attend the meeting. Equally, the voluntariness of a student's choice of an activity in which he wished to participate would be protected in that he could reject any other activity by simply not going to the place designated as that activity's meetingplace.

In the case at bar it appears that the access which plaintiffs seek is the opportunity to gather in the hallways of Antietam Junior High School in order to distribute *Issues and Answers*. Rather than attempting to obtain for themselves a meetingplace where they might gather with other like-minded students for discussion or religious-oriented activity, plaintiffs have chosen for the purpose of propagating the principles set forth in *Issues and Answers* to place themselves in an area through which many students are likely to proceed.

■ The court concludes that the distribution of *Issues and Answers* in the hallways of the school is not a "meeting" under the definition in 20 U.S.C. § 4072(3) or under the meaning of that term as it is contemplated in the report of the Senate Judiciary Committee. In the first place it is not the type of activity in which student groups at Antietam Junior High School are already permitted to engage under the school's limited open forum.[3] Those groups meet during an activity period at the end of the school day. Although one of those groups, the Newspaper Club, is permitted to distribute a school newspaper, the distribution of the paper takes place in the controlled environment of the homeroom period and is merely the culmination of activity which took place during the noninstructional time at the end of the school day. Further, the distribution of the school newspaper is viewed by defendant as an extension of the English curriculum and, therefore, is not comparable under the Equal Access Act to plaintiffs' noncurriculum-related distribution of *Issues and Answers*.

---

3. Although defendant argues that it has not created a limited open forum which encompasses plaintiffs' activities, it does not argue that no limited open forum has been created. Indeed, it is undisputed that defendant allows many, noncurriculum-related student clubs to meet on school premises during noninstructional time. *See* plaintiffs' Counterstatement of Undisputed Material Facts at ¶ 16. According to the definition in 20 U.S.C. § 4071(b), therefore, defendant has created a limited open forum.

In addition to falling outside the definition of "meeting" in 20 U.S.C. § 4072(3), the gathering of plaintiffs to distribute "Issues and Answers" in the school's hallways does not possess the characteristics of a meeting as described in the Senate report on the Equal Access Act. To the extent that the activity in which plaintiffs engaged went beyond the actual gathering of two or three students in the hallway to include the confrontation, albeit peaceful, of other students through the offer to those students of literature, the "meeting" conducted by plaintiffs was not "voluntary in the truest sense of the word." 1984 U.S.Code Cong. & Admin.News at 2374. Although the boys who decided to distribute the paper did so voluntarily, the students who were touched by plaintiffs' activity may not have chosen to be. There is no indication that plaintiffs attempted to compel anyone to accept a copy of *Issues and Answers*, but by conducting their activity in the hallways plaintiffs included in their activity students who had not necessarily selected that activity as one in which they wished to participate. As indicated in the Senate report, activities which are voluntary both for those who initiate them and those who participate in them are the activities which Congress intended to protect by enacting the Equal Access Act. Having concluded that the activity in which plaintiffs engaged does not fall within the protection of the Equal Access Act, the court holds that defendant is entitled to judgment as a matter of law on count two of the amended complaint.[4]

## B. *Freedom of Speech*

The first amendment to the United States Constitution provides in part that "Congress shall make no law ... abridging the freedom of speech...." U.S. Const. amend. I. The analysis of a claim alleging the violation of the first amendment right of free speech involves three steps. First, the court must determine whether the activity in which the claimant was involved is speech protected by the first amendment. If the activity does constitute protected speech, the court must then identify the nature of the forum in order to determine the extent of the government's authority to limit access to the forum. Finally, the court must decide whether the restriction imposed by the government satisfies the appropriate standard. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 797, 105 S.Ct. 3439, 3446–47, 87 L.Ed.2d 567 (1985).

### 1. *Protected Speech*

■ For good reason, defendant does not argue that the distribution by plaintiffs of *Issues and Answers* is not speech protected by the first amendment. The Supreme Court has clearly held that the right of free speech includes the right to distribute literature. *Martin v. Struthers*, 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). Therefore, the court concludes that the activity in which plaintiffs engaged is a form of protected speech.

### 2. *Type of Forum*

■ Before assessing the nature of the forum to which plaintiffs seek access, it is necessary to define the dimensions of that forum. *Cornelius*, 473 U.S. at 800, 105 S.Ct. at 3448. In *Cornelius*, the Supreme Court held that the forum should be defined by focusing on the access sought by the speaker. *Id.* at 801, 105 S.Ct. at 3449. Although plaintiffs in the case at bar have limited their distribution of *Issues and Answers* to the hallways of Antietam Junior High School, the parties apparently have rested their arguments concerning the nature of the forum on the assumption that plaintiffs seek general access to the school. Therefore, the court will focus its forum analysis on Antietam Junior High School as a whole rather than focusing specifically on the area where plaintiffs have distributed their newspapers.

---

4. It is interesting, though not dispositive, to note that at the time Principal Mesaros was deposed plaintiffs' counsel himself seemed to be of the opinion that the Equal Access Act had no application to this case. *See* Deposition of Mesaros at 19. Mesaros was deposed before the filing of the amended complaint, which added the Equal Access Act count to the causes of action asserted in the initial complaint.

A seminal case involving the freedom of speech rights of secondary school students is *Tinker v. Des Moines Independent Community School District*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In that case the defendant school district was sued by students whom the school had forbidden to wear black armbands in protest of the Vietnam War. Although the Supreme Court did not perform the type of forum analysis in which the Court has engaged in other freedom of speech cases, the Court did state some general principles regarding the school environment which affect the standard schools must meet in restricting speech. The Court began with the very basic statement that, "First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate." *Id.* at 506, 89 S.Ct. at 736. Going on to recognize that the school classroom is the "marketplace of ideas", *id.* at 512, 89 S.Ct. at 739 (citation omitted), the Court held that the "marketplace" should not be limited to the classroom:

> The principal use to which the schools are dedicated is to accommodate students during prescribed hours for the purpose of certain types of activities. Among those activities is personal intercommunication among the students. This is not only an inevitable part of the process of attending school; it is also an important part of the educational process. A student's rights, therefore, do not embrace merely the classroom hours. When he is in the cafeteria, or on the playing field, or on the campus during the authorized hours, he may express his opinions even on controversial subjects like the conflict in Vietnam, if he does so without "materially and substantially interfer[ing] with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.

*Id.* at 512–513, 89 S.Ct. at 739–740 (footnote and citation omitted).

In *Widmar v. Vincent*, 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981), an evangelical Christian organization that was denied permission to conduct its meetings in University facilities brought an action against the university alleging, among other things, that the school had violated its members' rights of free speech. The Court held that the University of Missouri had created an open, or public, forum for use by student groups. *Id.* at 267, 102 S.Ct. at 273. The University had done so by officially recognizing over one hundred student groups, providing facilities for the meetings of those groups, and by requiring students to pay an activity fee each semester to help offset the costs incurred by the University.

In a more recent opinion the Supreme Court summarized the different types of forums which exist on government property. *Perry Education Ass'n. v. Perry Local Educators' Ass'n.*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). The "quintessential", or traditional, public forum is a place such as a street or park which has been traditionally held open to the public for purposes of assembly, communication of thoughts, and discussion of public issues. *Id.* at 45, 103 S.Ct. at 954–55. The second type of forum is "... public property which the State has opened for use by the public as a place for expressive activity." *Id.* The Court recognized that the created public forum may be limited for use by certain groups, *id.* at 46, n. 7, 103 S.Ct. at 955 n. 7, and that if the public forum is a limited one "... the constitutional right of access would in any event extend only to other entities of similar character." *Id.* at 48, 103 S.Ct. at 956. Finally, the third type of forum is the nonpublic forum, property "... which is not by tradition or designation a forum for public communication...." *Id.* at 46, 103 S.Ct. at 955.

In *Perry* the forum about which the parties were debating was a school district's interschool mailing system. The Court held that the mailing system was not a public forum, because the school did not open the system for use by the general public. *Id.* at 47, 103 S.Ct. at 956. Groups

wanting to use the system were required to seek permission from the school principal. Although some outside groups were permitted to use the mailing system, such selective access did not transform the system into a public forum. *Id.*

Shortly after the Supreme Court rendered its opinion in *Perry,* this court, through Chief Judge Nealon, confronted a situation somewhat analogous to the one in the case at bar. *Bender v. Williamsport Area School District,* 563 F.Supp. 697 (M.D.Pa.1983), *rev'd,* 741 F.2d 538 (3d Cir. 1984), *vacated,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986), *reh'g denied,* — U.S. —, 106 S.Ct. 2003, 90 L.Ed.2d 682 (1986).[5] In *Bender* a group of students was denied permission to meet at the defendant's high school for purposes of praying and reading the Bible. In the course of holding that the defendant's denial of access to the group was unconstitutional, the district court found that the school had created a limited public forum by establishing an activity hour in which over twenty other student groups participated. *Bender,* 563 F.Supp. at 706. The school had never denied access to any other group which sought to benefit from the activity period, and the school principal took the position that any "legal and proper" group would be granted access. *Id.* The court noted that a limited forum is one from which "outsiders" could be excluded without violating the first amendment. *Id.* at 705. The court also qualified its finding that the school had created a limited public forum with the recognition of the special order and discipline needs that a high school has. Because of these special needs, the court, relying on *Tinker,* ruled that a school may legitimately exclude an activity if it interfered with the school's work or with the rights of other students. *Id.* at 707.

Although the Third Circuit Court of Appeals reversed the decision of the district court in *Bender,* the appellate court did agree that the high school had created a limited public forum, access to which was restricted to students of the high school. *Bender,* 741 F.2d at 549. In a more recent case, however, the Third Circuit Court held that a school athletic field had not been transformed into a public forum by the defendant school district. *Student Coalition for Peace v. Lower Merion School District,* 776 F.2d 431, 436 (3d Cir.1985). The Lower Merion School District had allowed various non-school organizations to use its athletic field but denied access to the field to a student group which desired to conduct a "Peace Fair" on the field. Because it was the policy of the school district to require organizations to request permission before using the field, and because such permission was not granted of course, the Third Circuit Court found that the school district had not designated the field as a public forum. *Id.*

In the case at bar plaintiffs assert, and defendant does not dispute, that defendant "... has adopted a policy of allowing students at [Antietam Junior High School] to engage in various noncurriculum related activities. Included among these, students are allowed to choose from 29 various student clubs which meet twice each week during non-instructional time at the end of the school day." Plaintiffs' Statement of Undisputed Material Facts at ¶ 16. There is nothing in the record which indicates that access to the facilities at Antietam has ever been denied to a student group wanting to meet during the time set aside for student activities. There is no evidence which shows that permission to meet is not granted to student groups as a matter of course. Further, an undisputed assertion in plaintiffs' amended complaint indicates that the nature of the student groups in

5. Although the decision of the district court was reversed by the Third Circuit Court of Appeals, the decision of the Third Circuit itself was vacated. Therefore, this court finds that the opinion of the district court is still persuasive as to the issues which are common to *Bender* and the case at bar. "While the judges of a unified federal district are not constitutionally or legally bound to march in lockstep, the seeds of chaos are sown if a single court prances off in sharply conflicting directions ... Thus, 'absent unusual or exceptional circumstances, judges of coordinate jurisdiction within a jurisdiction should follow brethren judges' rulings.'" *Fricker v. Town of Foster,* 596 F.Supp. 1353, 1356 (D.R.I.1984) (citation omitted).

existence is fairly diverse,[6] which supports an inference that permission to use the school's facilities has not been limited to groups having a specific subject matter. On the other hand defendant has enforced a policy which prohibits parties who are not students from distributing literature in the school which is not school-sponsored. *See* Defendant's Statement of Undisputed Material Facts at ¶ 21 and Plaintiff's Amended Counterstatement of Undisputed Material Facts at ¶ 20.

Applying the opinions summarized above to the facts in the instant case, the court finds that defendant has created a limited public forum at Antietam Junior High School. The forum is limited in that access thereto is restricted to student groups, such as was the case in *Widmar* and *Bender*. Although permission may be required for use of the facilities by student groups during the time set aside for student activities, the fact that there is no indication that permission is not granted as a matter of course distinguishes this case from *Perry Educators' Ass'n.* and *Student Coalition.*

### 3. Review of the Restrictions Under the Appropriate Constitutional Standard

In *Tinker*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, the Court stated that "[i]n the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." *Id.* at 511, 89 S.Ct. at 739. A constitutionally valid reason for the regulation of speech would exist if the forbidden speech "materially disrupts classwork or involves substantial disorder or invasion of the rights of others...." *Id.* at 513, 89 S.Ct. at 740. On the other hand fear that expression of an unpopular viewpoint may cause a disturbance or create discomfort is not a constitutionally valid reason for regulating speech:

... [I]n our system, undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 [69 S.Ct. 894, 93 L.Ed. 1131] (1949); and our history says it is this sort of hazardous freedom—this kind of openness—that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker*, 393 U.S. at 508–509, 89 S.Ct. at 737–738.

In freedom of speech cases following *Tinker* the Court determined what standard should be applied to a school's restriction of expression according to the type of forum involved. If the school has created a public forum and has restricted protected speech on the basis of the content of the speech, the school "... must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Widmar*, 454 U.S. at 270, 102 S.Ct. at 274 (citation omitted). *See also Perry Education Ass'n.*, 460 U.S. at 46, 103 S.Ct. at 955–56. Even when the created public forum is a limited one, the school must still satisfy the "compelling state interest" test if the restrictions it has imposed are not necessitated by the nature and purpose of the forum. *Bender*, 563 F.Supp. at 705. On the other hand, "[t]he State may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Perry*, 460 U.S. at 45, 103 S.Ct. at 955 (citations omitted).

---

6. Paragraph eleven of the amended complaint alleges that the clubs include the Newspaper Club, the Art Club, the Photography Club, the Trivial Pursuit Club, the Reading Club, and the Movie Club.

In the case at bar the restrictions imposed on the distribution of *Issues and Answers* were the result of a discussion between the principal of Antietam Junior High School, Robert Mesaros, and defendant's superintendent, Dr. Richard Shelton. As noted earlier, Mesaros sent a memorandum to the parents of Bryan Thompson on April 29, 1986 which set forth the time and the place in which plaintiffs would be permitted to distribute *Issues and Answers.* The memorandum supplied the following basis for the restrictions that were imposed:

> Consistent with the regulations of the Pennsylvania Department of Education, the Waynesboro Area School District requires students to submit for the prior approval a copy of all materials to be displayed, posted or distributed on school property. Consistent therewith, school officials may set forth the time and place of distribution so that distribution does not materially or substantially interfere with the educational process, threatens [sic] immediate harm to the welfare of the school or community, encourages [sic] unlawful activity or interferes [sic] with another individual's rights.

Amended Complaint, Exhibit D.

Transcripts of the depositions of Shelton and Mesaros provide some additional insight into the reasons defendant had for restricting plaintiffs' distribution of *Issues and Answers.* Dr. Shelton testified that one of the primary concerns that he and Mesaros had with regard to the distribution of the papers was possible congestion of traffic in the school's hallways and disruption of school activities. Both Shelton and Mesaros, however, stated in their depositions that there was no indication plaintiffs' distribution of the papers on April 28, 1986 did in fact cause congestion of traffic or disruption of the educational process. Deposition of Shelton at 60, 61 and 62 and Deposition of Mesaros at 33. Another concern on the part of the administrators regarded the religious content of *Issues and Answers.* Although Dr. Shelton was not sure in his deposition that the "religious bent" of *Issues and Answers* was a major concern, deposition of Shelton at 69, the testimony of Principal Mesaros indicates that the religious content of the paper definitely influenced the decision of the administrators to some extent.

Mesaros deposed that he was concerned with the "... rights of the student body at large." Deposition of Mesaros at 40. He feared that parents would object to their children being exposed to the distribution of *Issues and Answers* in the public school setting. *Id.* at 40, 41. There was concern on his part that some might perceive the school's permission for the distribution of the paper as an endorsement of the paper by the school. *Id.* at 43. In Mesaros' opinion, allowing the distribution of the religious material outside the building would be a compromise of the students' freedom to distribute and the school's concern about the paper's content. *Id.* at 66. Perhaps the following statement by Mesaros best summarizes the concern he had about the content of *Issues and Answers:*

> Well, the question that comes to my mind is, this is religious material coming into a public school, what about the legality of the protection of other students, public school students from those materials when they and their parents may object to that. And also, if this material comes into school, what other religious viewpoint publications would be permitted to come to the school as well. And as a public school where we have students who are there by law who must be there, that there's a separation from those students from the religious material by law.

Deposition of Mesaros at 72.

The court concludes primarily on the basis of Mesaros' deposition that the restrictions placed on the distribution of *Issues and Answers* were at least to some extent content-based and were not merely content-neutral time, place, and manner restrictions. Therefore, to pass constitutional muster the restrictions must be narrowly drawn to a compelling state interest. Defendant concedes this point, *see* defendant's memorandum in support of its motion for summary judgment at 14, n. 6, but argues that defendant's desire to avoid violating the establishment clause of the first

amendment is a compelling state interest which justifies the restrictions.

The clause on which defendant relies provides that "Congress shall make no law respecting an establishment of religion...." U.S. Const. amend. I. For the purpose of determining whether there has been a violation of the establishment clause, the Supreme Court has developed a three-part test. To avoid violation of the establishment clause the disputed statute or restriction must have a secular purpose. Also, its primary effect must be one that neither advances nor inhibits religion. Finally, the statute or restriction must not cause excessive government entanglement with religion. *Lemon v. Kurtzman*, 403 U.S. 602, 612, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971).

In *Widmar v. Vincent*, 454 U.S. at 271, 102 S.Ct. at 275, the Supreme Court applied the *Lemon* test to an argument substantially similar to the one facing this court. In *Widmar* the University of Missouri contended that its desire to avoid violating the establishment clause was a compelling state interest that justified barring the evangelical Christian organization from meeting on the college campus. The Court disagreed. In the first place the Court found that the university would risk greater entanglement with religion by attempting to enforce its exclusion of religious speech than by allowing the group to meet. *Id.* at 272, n. 11, 102 S.Ct. at 275 n. 11. The Court also concluded that the fact that the religious organization stood to benefit from the open forum created by the university did not constitute the advancement of religion. *Id.* at 273, 274, 102 S.Ct. at 276, 276–277. Creating an open forum in a university, the court found, does not "... confer any imprimatur of state approval or religious sects or practices." *Id.* Finally, the Court held that creating an open forum which benefits both nonreligious and religious groups has a secular effect. *Id.*

The district court in *Bender v. Williamsport Area School District*, 563 F.Supp. at 708, applied the establishment clause discussions in *Lemon* and *Widmar* to the secondary school setting. In *Bender* the Williamsport High School had established an after-school activity period and thereby created a limited open forum. The purpose of the activity period was "... to promote the intellectual, physical and social development of its students." *Bender*, 563 F.Supp. at 709. Thus, the court concluded that the purpose of the open forum was a secular one and that the use by a religious organization of that forum did not affect the secular purpose of the forum. *Id.* The court then proceeded to find that allowing the plaintiff religious organization to meet would not have the primary effect of advancing religion or fostering school entanglement with religion. *Id.* at 709, *et seq.*

Applying *Widmar* and the holding of the district court in *Bender* to the case at bar, this court concludes that defendant would not be violating the establishment clause of the first amendment by permitting the distribution of *Issues and Answers* in Antietam Junior High School according to reasonable time, place, and manner restrictions as those restrictions are enforced with respect to the other activities which take place in the school's limited open forum. Such a policy would satisfy each of the three elements of the *Lemon* test.

a. *Secular Purpose*

In the first place, allowing plaintiffs to gather for the purpose of distributing *Issues and Answers* in the same way that other student clubs gather would have a secular purpose. Although the court cannot find in the record a clearly stated purpose for allowing student clubs to meet at Antietam Junior High School, the names of the clubs that meet give some indication of the school's purpose. The fact that the available student activities include the Newspaper Club, the Art Club, the Photography Club, the Trivial Pursuit Club, the Reading Club and the Movie Club strongly supports an inference that defendant, like the defendant school district in *Bender*, seeks in its maintenance of a limited public forum to promote the intellectual and social development of its students. Allowing plaintiffs to avail themselves of that forum would not change the secular nature of the *school's* objective, despite the fact that

*plaintiffs* have a nonsecular purpose in meeting. *See Bender,* 563 F.Supp. at 709.

### b. *Advancement or Inhibition of Religion*

Neither would allowing plaintiffs to meet and distribute *Issues and Answers* pursuant to the school's limited public forum have the effect of advancing religion. The Supreme Court in *Widmar* clearly stated that accommodation by a university of a religious organization in accordance with a limited public forum does not constitute a state imprimatur on the particular religion involved. *Widmar,* 454 U.S. at 274, 102 S.Ct. at 276–76. This principle was applied to the high school setting by the district court in *Bender,* 563 F.Supp. at 711. In *Bender* the court concluded that in a high school which already accommodated more than twenty-five student activities encompassing a broad range of interests, passive accommodation of one more group that was organized on the basis of religious interest would not have the effect of advancing religion. "Any advancement of religion would come from the students themselves, and this the Establishment Clause does not bar, it being a limitation on government conduct rather than on individual activity." *Id.*

Subsequent to the holdings in *Widmar* and *Bender* Congress enacted the Equal Access Act, 20 U.S.C. §§ 4071–4074, which has been discussed to some extent earlier in this memorandum. Although this court has determined that the conduct in which plaintiffs engaged prior to the initiation of the instant lawsuit does not fall within the protection of the Equal Access Act, certain principles contained in the legislative history of the Act are applicable to the establishment clause issue. The Senate Judiciary Committee squarely addressed the establishment clause problem in enacting the Act and, relying on *Widmar,* concluded

that allowing secondary school students to meet for religious purposes under the same restrictions that controlled other student activities would not subject a school to allegations that its policy was effecting the advancement of religion. S.Rep. No. 357, 98th Cong., 2d Sess., *reprinted in* 1984 U.S.Code Cong. & Admin.News 2348, 2379–2382. In reaching this conclusion the Senate Judiciary Committee specifically found that "... students below the college level are capable of distinguishing between state-initiated, school-sponsored, or teacher-led religious speech on the one hand and student-initiated, student-led religious speech on the other." *Id.* at 2381.

On the basis of the holding in *Widmar,* the district court's decision in *Bender,* and the statements of the Senate Judiciary Committee in its report on the Equal Access Act, the court finds that defendant would not be adopting a policy which would unconstitutionally advance religion if it permitted plaintiffs under certain conditions to distribute *Issues and Answers* in Antietam Junior High School.[7] In the court's opinion the comments of the Senate Judiciary Committee and the Equal Access Act itself[8] indicate a general recognition that junior high school students have the maturity to recognize that a school's accommodation of a religious organization does not constitute approval of the religion. *Widmar* and *Bender* also both stand for the proposition that accommodation does not equal advancement.

However, the type of accommodation which the Court in *Widmar* and the district court in *Bender* were considering was coextensive with the accommodations provided to other student groups. In other words the access to school facilities which the religious organizations in *Widmar* and *Bender* were seeking was the same access which other students enjoyed. This point

---

7. Indeed, by prohibiting the distribution of *Issues and Answers* inside the school building because of the paper's religious content the school may actually be engaging in hostility toward religion. "The establishment clause acts as a prescription against hostility to, as well as advancement of, religion." *Bender,* 563 F.Supp. at 714 (citations omitted).

8. The Act guarantees equal access to *secondary* school students. It is undisputed that Antietam Junior High School is a secondary school, as that term is understood under Pennsylvania law. *See* Amended Complaint at ¶ 5 and Answer to Amended Complaint.

is important in light of the court's decision that *under certain conditions* permitting plaintiffs to distribute *Issues and Answers* would not have the effect of advancing religion. Assuming that defendant continues to maintain a limited open forum,[9] it will avoid an advancement of religion problem by permitting the distribution of *Issues and Answers* according to the same content-neutral time, manner, and place restrictions that are imposed on the other student activities at Antietam Junior High School. If, for example, defendant requires student clubs engaged in noncurriculum activities to meet in a designated room at a designated time under adult or teacher supervision, defendant could legitimately impose the same restrictions on plaintiffs. As noted earlier, if those restrictions are tailored to a significant interest, such as preventing the disruption of the educational process, then the imposition of reasonable time, manner, and place restrictions is constitutionally permissible. *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55; *Tinker,* 393 U.S. at 513, 89 S.Ct. at 740. By imposing such restrictions and by passively accommodating plaintiffs to the same extent that it accommodates other groups, defendant can thereby avoid unconstitutionally advancing religion.

Defendant relies on the opinion of the Third Circuit Court of Appeals in *Bender,* 741 F.2d at 550, *et seq.,* in support of its argument that it would be advancing religion if it permitted distribution of *Issues and Answers* in the school. Upon reviewing the district court's decision, the Third Circuit Court disagreed with the lower court's conclusion that allowing the religious organization to meet on school premises would not have the effect of advancing religion. *Bender,* 741 F.2d at 555. The Third Circuit Court distinguished the *Widmar* holding on the basis of the differences between university and high school students. Those differences included the fact that attendance at high school is compulsory, that all meetings occurring during the activity period at the high school were required to be monitored by a teacher, parent, or adult, and that a high school student is less likely than a college student to understand the "subtleties and intricacies of the first amendment...." *Id.* at 554. Recognizing these differences the court held that "... the Establishment Clause does become implicated when the existence of religion within the school creates the perception among schoolchildren that the State has approved a religious activity and thus has placed its imprimatur on religion. We believe that the danger of communicating such state approval of religion is presented in this case." *Id.*

For two reasons this court will not follow the decision of the Third Circuit Court. As noted earlier, the Supreme Court vacated the decision, although not on the grounds that the court had erred in its discussion of the law.[10] But more importantly the spirit of the Equal Access Act, passed after the Third Circuit Court issued its decision in *Bender,* contradicts the position taken by the court on the issue of advancement of religion. It is evident from the legislative history of the Act that secondary school students are no longer assumed to have less capability than university students to distinguish between government-initiated and student-initiated religious activity. Further, accommodation of religious activity by secondary schools on school premises in a manner equal with the accommodation with other student activities is not only regarded by Congress as not being an advancement of religion, it is mandated by the Equal Access Act. 20 U.S.C. § 4071. The Third Circuit Court itself has recognized, without criticism, that the Equal Access Act "... was adopted in large measure to extend to secondary schools by legislative action the constitutional princi-

9. Having created a limited public forum, defendant is not required to indefinitely retain the open character of the facility. *Cornelius,* 473 U.S. at 802, 105 S.Ct. at 3449.

10. The basis for vacating the decision of the Third Circuit Court was the Supreme Court's finding that the individual who appealed the holding of the district court did not have standing to do so. *Bender v. Williamsport Area School District,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986).

ples adopted by the Supreme Court in the university context in *Widmar...*." *Student Coalition for Peace v. Lower Merion School District*, 776 F.2d at 439. Thus, it does not appear that the court would continue to take the same position as it did in *Bender*.

### c. *Entanglement*

If defendant imposes the same reasonable time, place, and manner regulations on plaintiffs' activities that it imposes on other student activities, the foreseeable entanglement need not be excessive but could be limited to some form of supervision. Neutral supervision without active involvement by a teacher or school official in plaintiffs' activities would not be violative of the establishment clause. *Bender*, 563 F.Supp. at 715.

In summary, defendant has not shown that the restrictions it has imposed on the distribution of *Issues and Answers* are narrowly drawn to the compelling interest of avoiding violation of the establishment clause of the first amendment. Nor has defendant demonstrated that its restrictions are narrowly drawn to either of the other compelling state interests which have been recognized as validly supportive of content-based restrictions on speech. *Tinker v. Des Moines School District*, 393 U.S. at 513, 89 S.Ct. at 740. There is no evidence on the record that plaintiffs' initial distribution of *Issues and Answers* caused any material interference with the requirements of appropriate discipline in the operation of the school; nor is there any evidence that plaintiffs' distribution of the papers collided with the rights of other students. Even if those interests were present in this case, the court has difficulty in understanding how allowing plaintiffs to distribute immediately outside the school building but not in it would serve those interests. Further, the concern of Mr. Mesaros that other students and their parents may object to the introduction of *Issues and Answers* into the school does not justify a content-based restriction. "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker*, 393 U.S. at 509, 89 S.Ct. at 738.

■ Having found that defendant's restrictions are not narrowly drawn to any compelling state interest, the court concludes that by restricting plaintiffs' distribution of religious literature to an area literally outside the "schoolhouse gate" defendant has abridged plaintiffs' freedom of speech in violation of the first amendment. The court arrives at this conclusion cautiously, recognizing the deference which federal courts should ordinarily pay to school officials and their authority to resolve conflicts arising in the day-to-day operations of schools. *Board of Education, Island Trees Union Free School District No. 26 v. Pico*, 457 U.S. 853, 864, 102 S.Ct. 2799, 2806–07, 73 L.Ed.2d 435 (1982); *Tinker*, 393 U.S. at 507, 89 S.Ct. at 736–37. At the same time, however, the court recognizes the principle that schools must exercise their authority in conformity with the Constitution. *Id.* There is ample evidence on the record that the school officials in the case at bar made every effort to comply with the Constitution in balancing plaintiffs' rights with what they perceived to be the school's responsibility to protect the rights of others. The court commends the efforts of the officials but is constrained to find that the restrictions which were imposed are constitutionally infirm. As discussed earlier, however, the court's conclusion in no way affects defendant's power to enforce reasonable time, place, and manner regulations on plaintiffs' distribution of *Issues and Answers* within the Antietam Junior High School. Nor should defendant fear that the court's decision will open the doors of Antietam Junior High School to members of the general public who wish to distribute literature in the school. *Bender*, 563 F.Supp. at 705. The court has found only that defendant created a limited public forum at the school and that plaintiffs, as students of the school, should be free to distribute their literature in that forum ac-

cording to reasonable time, place, and manner restrictions.

## C. *Free Exercise of Religion*

■ "Congress shall make no law ... prohibiting the free exercise [of religion]...." U.S. Const. amend. I. "Where the state conditions receipt of an important benefit upon conduct proscribed by a religious faith, or where it denies such a benefit because of conduct mandated by religious belief, thereby putting substantial pressure on an adherent to modify his behavior and to violate his beliefs, a burden upon religion exists." *Thomas v. Review Board of the Indiana Employment Security Division,* 450 U.S. 707, 717–718, 101 S.Ct. 1425, 1432, 67 L.Ed.2d 624 (1981). The right to the free exercise of religion includes the right to proselyte. *McDaniel v. Paty,* 435 U.S. 618, 626, 98 S.Ct. 1322, 1327–28, 55 L.Ed.2d 593 (1978) (Burger, C.J., plurality opinion).

In the action before this court the affidavit of Bryan Thompson declares that Bryan distributed *Issues and Answers* out of a desire to lead his fellow students to the Lord. Plaintiffs' Memorandum in Support of Plaintiffs' Motion for Summary Judgment, Exhibit C. Not only does Bryan feel that he has a responsibility to share his beliefs with his fellow students, he is of the opinion that such proselytization is mandated by the Bible. *Id.* Bryan further declares that he has found the distribution of *Issues and Answers* to be a "proven, tactful way" of fulfilling his responsibility to share his beliefs, *id.,* but Bryan does not declare that distribution of the paper is the only way to fulfill his responsibility. An examination of the transcripts of Christopher Eakle's and Marc Shunk's depositions reveals that they have beliefs similar to those of Bryan Thompson. *See* Deposition of Marc Shunk at 7, 8 and Deposition of Christopher Eakle at 8.

Although the court does not question the validity of plaintiffs' religious beliefs and recognizes that the right to freely exercise their religion encompasses the right of plaintiffs' to share their beliefs, the court holds that defendant did not prohibit plaintiffs from freely exercising their religion by requiring them to distribute *Issues and Answers* outside the school building. Defendant did not completely prohibit the type of conduct which Bryan Thompson feels is mandated by his religious beliefs. There is no evidence that plaintiffs were not free to share their religious beliefs with other students in ways other than the distribution inside the school building of *Issues and Answers.* Defendant did not even completely prohibit the distribution of the paper. In short, the facts show that plaintiffs were not forced by defendant to choose between neglecting their religious beliefs or forfeiting the state benefit of an education—plaintiffs were merely forced to select either another area or another method in which to engage in the conduct mandated by their beliefs. *See* Bender, 563 F.Supp. at 703.

### *Conclusion*

On the basis of the preceding discussion the court finds that plaintiffs are entitled to judgment as a matter of law on Count I of the amended complaint, insofar as it alleges a violation by defendant of plaintiffs' right to free speech. The court will enter an order declaring the restrictions placed by defendant on plaintiffs' distribution of *Issues and Answers* to be in violation of plaintiff's freedom of speech as guaranteed by the first amendment, and the court will enjoin defendant from refusing to allow plaintiffs to distribute *Issues and Answers* inside Antietam Junior High School. However, the court will also recognize the authority of defendant to impose content-neutral time, place, and manner restrictions.

The court finds that defendant is entitled to judgment as a matter of law as to Count I of the amended complaint, insofar as it alleges a violation by defendant of plaintiffs' right to freely exercise their religion. Also the court finds that defendant is entitled to judgment as a matter of law as to Count II of the amended complaint. The motions for summary judgment do not address Counts III and IV of the amended complaint and the court will deem them to

be moot unless good cause is shown why they should be deemed otherwise.

Plaintiffs have asked the court to enter an order declaring that they are entitled to nominal or compensatory damages. Plaintiffs cite no authority nor demonstrate the existence of any facts which would support such a declaration, and therefore the court declines to make it. Plaintiffs may, however, be entitled to a reasonable attorney's fee pursuant to 42 U.S.C. § 1988 and will be given an opportunity to petition therefor.

#### ORDER

In accordance with the accompanying memorandum, IT IS HEREBY ORDERED THAT:

1) The court declares defendant's restrictions on plaintiffs' distribution of *Issues and Answers* to be in violation of plaintiffs' right of free speech as guaranteed by the first amendment to the United States Constitution.

2) Defendant is enjoined from refusing to allow plaintiffs to distribute *Issues and Answers* inside Antietam Junior High School.

3) Defendant may, however, impose content-neutral time, place, and manner restrictions on plaintiffs' distribution of the paper inside the school.

4) If it is plaintiffs' desire to petition this court for attorney fees, they shall do so within twenty (20) days of the date of this order. Plaintiffs shall support their petition with a memorandum of law.

5) Defendant may respond to plaintiffs' petition within fifteen (15) days of the date plaintiffs serve their petition and supporting memorandum upon defendant.

6) Plaintiffs may file a reply to defendant's response within ten (10) days of the service of defendant's response.

7) Within twenty (20) days of the date of this order if no petition for attorney fees is filed, or upon disposition of plaintiffs' petition if one is filed, the court will direct the entry of judgment as follows:

a) In favor of plaintiffs and against defendant on Count I of the amended complaint insofar as it alleges a violation by defendant of plaintiffs' right of freedom of speech;

b) In favor of defendant and against plaintiffs on Count I of the amended complaint insofar as it alleges a violation by defendant of plaintiffs' right of freedom to exercise their religion;

c) In favor of defendant and against plaintiffs on Count II of the amended complaint; and

d) Counts III and IV of the amended complaint are deemed moot.