Scott **SLOTTERBACK**, a Minor, by and through his Parents and Legal Guardians Charles **SLOTTERBACK** and Theresa **Slotterback**

v.

**INTERBORO SCHOOL DISTRICT.**

No. 90–2559.

United States District Court, E.D. Pennsylvania.

May 13, 1991.

---

J. Michael Considine, Jr., James P. O'Brien, West Chester, Pa., for plaintiff.

Michael I. Levin, Cleckner and Fearen, Abington, Pa., Thomas L. Kelly, Gibbons, Buckley, Smith, Palmer & Proud, P.C., Media, Pa., for defendant.

## MEMORANDUM OF DECISION

McGLYNN, District Judge.

Adjustment of the inevitable conflict between free speech and other interests is a problem as persistent as it is perplexing. This case involves the tension between the first amendment free speech claim of a high school student distributing literature and a school district's claim that the establishment clause of the first amendment overrides free speech guarantees in the high school context. The student seeks declaratory and injunctive relief grounded on the first and fourteenth amendments, as well as on 42 U.S.C. § 1983. Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343. The court resolves the conflict between the two constitutional guarantees in favor of the student.

Plaintiff Scott Slotterback is a sixteen-year-old eleventh grade student at Interboro Senior High School (ISHS) in Prospect Park, Pennsylvania. Plaintiff's Deposition at 6; Defendant's Brief at 1. Defendant Interboro School District is a public school district with administrative offices in Prospect Park. Second Amended Complaint ¶ 4.

Encouraged by his church to bear witness to his Christian faith, plaintiff began to distribute religious tracts at ISHS during the autumn of his sophomore year, 1989–90. Plaintiff's Deposition at 17, 27–32; Defendant's Brief at 1. He was joined by a friend, Keith Ferry, who is a grade below plaintiff at ISHS. Ferry Deposition at 6, 9, 10; Defendant's Brief at 2. Designed like comic strips, the tracts depicted a twentieth-century man's death and resurrection. Under each frame was a quotation from the Bible. Defendant's Brief, Exhibit 1.

According to plaintiff, he distributed tracts to students in the hallways and cafeteria area of ISHS approximately forty-four times between November 1989 and May 1990. Plaintiff's Deposition at 23, 26–27, 32. Only once did he distribute in a classroom. Id. at 31. Ferry, on the other hand, testified at his deposition that he began distributing in the hallways and cafeteria area of the school in September and October 1989, and that he distributed in a classroom twice during that period. Ferry Deposition at 20–24. Between October 1989 and May 1990, Ferry distributed tracts over a dozen times in the hallways and cafeteria area, in addition to leaving tracts on the school's bathroom sink, on the bathroom toilets, and at a bus stop. Id. at 32–33.

Several teachers testified that the distributions affected activities at ISHS.

Resource room instructor Nancy Miller stated that in October 1989 she saw a student holding a tract in class and chiding plaintiff about its contents. Miller Affidavit at 1. When instructed to put the tract away, the student did so, and classroom instruction began. Id. Throughout the 1989–90 school year, Miller found tracts at plaintiff's station in her classroom and on radiator covers in the hallways. In addition, Miller observed plaintiff place tracts on a school staircase. Id. at 2–3. According to Miller, "The littering of these booklets exceeded that of any other articles left by students in the hallways." Id. at 3.

English teacher Anne Marie Orloff stated that she found students reading tracts in her class twice in October 1989. The students put the tracts away when asked to do so. Orloff Affidavit at 1–2. Ferry was in the classroom on both occasions.

A third teacher, Denise Englander–Kraut, testified that she witnessed several incidents related to distributions, although the exact chronology of the incidents is unclear.

On one occasion, she confiscated a tract that a student was reading during classroom instruction. Kraut Deposition at 3–9. On another occasion, she observed plaintiff and between four and nineteen other students gathered in a hallway and blocking student traffic between class periods. Id. at 11–28. The students dispersed when asked to do so. Kraut did not remember seeing tracts in the students' possession. Id. at 17.

On a separate occasion, one of Kraut's classes was delayed five minutes when a student arrived late. Id. at 29–37. The student was carrying one of plaintiff's tracts and blamed the tardy arrival on a blockage in the hallways. Id.

Two further incidents involved Ferry. The first occurred while Ferry was attending one of Kraut's classes. Between ten and fifteen minutes before class ended, Kraut completed her instruction and gave the class free time. Ferry then distributed tracts to students. Kraut confiscated the tracts and sent Ferry to meet with the assistant principal at ISHS, Albert Chelius. Ferry Deposition at 25–27. A week later, at the end of one of Kraut's classes, approximately twenty tracts fell out of Ferry's pocket while he was preparing to leave class. Kraut confiscated the tracts and took them to the school's principal. Id. at 28; Kraut Deposition at 55–56.

Finally, Kraut testified that on another occasion plaintiff and between four and nineteen other students caused a blockage in the school's hallways when they distributed tracts between class periods to pass-

ing students.[1] Kraut stated that, when she told the students to go to their classes, plaintiff became belligerent and used obscenities. Kraut Deposition at 38–40. Kraut then took plaintiff to Principal Nicholas Cianci's office.[2]

When plaintiff arrived at Cianci's office, Cianci ordered him to cease his hallway distributions or risk suspension. Subsequently, Cianci consulted the school district's solicitor about plaintiff's conduct. Meanwhile, plaintiff continued his distributions. Cianci Deposition at 17, 25; Plaintiff's Motion ¶¶ 2–3; Defendant's Brief at 3.

Cianci then met again with plaintiff and handed him a handwritten note setting forth the permissible time, place, and manner of future distributions. Such distributions would be permitted only twice during the remainder of the school year; would be restricted to the area around the exit doors of ISHS; and would have to occur after school hours, without "argument[s], fights, or litter." Cianci was to be notified in advance of the distribution dates chosen. Defendant's Brief at 3, Exhibit 4; Plaintiff's Motion ¶ 3; Cianci Deposition at 25–26.

Plaintiff filed this action on April 13, 1990.

Between April and July 1990, Interboro School District developed an official "Procedure for Distribution of Non–School Written Materials" (the new policy) (see Appendix). See Cianci Deposition at 32–36. Designed to regulate the distribution of written material that is not "part of the curricular or extracurricular programs of the Interboro School District," the new policy sets forth the following procedure for the distribution of such nonschool material within the district's schools: (1) Parties desiring to distribute such material must present a sample to the building principal three days prior to the day proposed for distribution; (2) The building principal or his nominee is then to review the material and approve its distribution in writing, unless the material falls within one of seven prohibited categories listed in a "Schedule A"; (3) Once distribution is approved, the party must advise the principal of the days of distribution; (4) Such distribution is to be made "at the time of normal dismissal of the students from the building(s) where the distribution is to occur, ... inside or outside the exit doors of the building(s)," on as many days as requested, but in a "peaceful ... non-argumentative manner," without littering; and (5) If the principal "determines that such distribution materially and substantially interferes with the safe and orderly passage of students ... and/or materially and substantially interferes with the requirements for appropriate discipline in the operation of such building(s)," then the principal must terminate the distribution by giving written notice to the distributing party. The new policy provides various sanctions for violations of the procedure, which range from a simple written notice to prosecution for criminal trespass.

Among the seven categories of "unacceptable non-school written material(s)" listed in Schedule A are:

.    .    .    .    .

2. Material(s) that promotes hostility, disorder, violence or the commission of a crime.

3. Material(s) that proselytizes a *particular* religious or political belief.

.    .    .    .    .

5. Material(s) that ... invades the rights of others or inhibits the functioning of the school, or advocates interference with the rights of any individual or with the normal operation of the school.

Although ISHS students were not informed of the new policy until late November 1990, and although the policy has yet to appear in the school district's handbooks, the policy is "the current accepted proce-

---

1. Plaintiff states that this distribution occurred on December 17, 1989; ISHS Principal Nicholas Cianci contends that it occurred in March 1990. *Compare* Plaintiff's Deposition at 41–44 *with* Cianci Deposition at 7.

2. Plaintiff testified, to the contrary, that no more than four or five students were ever gathered in the hallways during distributions and that he never used obscenities in Kraut's presence. Plaintiff's Affidavit.

dure for distribution of nonschool written materials at [ISHS]...." Cianci Deposition at 38; *see also* Defendant's Brief at 3; Staub Deposition at 16.

In recent years, students belonging to extracurricular groups at ISHS—most of which have faculty advisors—have been permitted to distribute literature at the school. For example, Students Against Drunk Driving (SADD), which has a faculty advisor, has been allowed to distribute group literature at least two times each school year, during lunchtime, at tables outside the school cafeteria. Defendant's Supplemental Answers to Plaintiff's Interrogatories, No. 6; Defendant's Brief at 4.[3] Assistant Principal Chelius testified that SADD materials have, on occasion, been found littered. Chelius Deposition at 27.

In addition, several community groups— the Boy Scouts of America, the Norwood Athletic Club, the Norwood Senior Citizens Group, the Prospect Park Alumni Association, and the Interboro Area Ministerium, which plaintiff asserts is a religious group—have used ISHS facilities in recent years. Defendant's Supplemental Answers to Interrogatories, Attachments.[4]

During the 1990–91 school year, plaintiff and Ferry have continued to distribute tracts throughout ISHS. There is no evidence in the record that any of those distributions has resulted in disruption. *See* Plaintiff's Post–Oral Argument Addition to Motion at 2; Plaintiff's Affidavit; Ferry Deposition at 42–45; Cianci Deposition at 13–14.

The parties have filed cross-motions for summary judgment, and plaintiff has twice amended his complaint for declaratory and injunctive relief. Oral argument was held on March 12, 1991.

Plaintiff contends that his distribution of religious tracts is first amendment protected speech and that, as a consequence, the school district's new policy should be analyzed in the light of Supreme Court opinions undertaking a public forum analysis.

According to plaintiff, the school district, by opening ISHS for use by community groups and for distributions by community organizations and student groups such as SADD, has created a "limited public forum." As a result, the court's strict scrutiny should be applied to the school district's content-based exclusion of "[m]aterial[ ] that proselytizes a *particular* religious or political belief." Because that exclusion is not narrowly tailored to a compelling interest and because it is unconstitutionally vague, it should, plaintiff argues, be declared invalid on its face and as applied to him.

Plaintiff similarly challenges on vagueness and overbreadth grounds the absolute ban in Schedule A on distribution of material that invades the rights of others or advocates interference with individual rights and the proper functioning of ISHS.

Moreover, plaintiff argues that the time, place, and manner regulations in the new policy fail the test of narrow tailoring to which content-neutral regulations in a limited public forum are subject. Plaintiff points specifically to SADD's distributions in hallways near the school's cafeteria and to the absence of any distribution-related disturbances during the current school year. He argues that distribution of nonschool materials should be permitted, at the very least, near exit doors before and after school *and* in hallways adjacent to the cafeteria at lunchtime.

Finally, plaintiff contends that the portions of the regulations granting building principals discretion to approve or disapprove distributions and to impose sanctions, as well as the requirement of advance notice and submission, operate as unconstitutional prior restraints. To justi-

---

**3.** Nonstudent community organizations that have distributed literature to ISHS students in school or that have used school bulletin boards include the Norwood Town Watch (distributed literature in homerooms) and local fire companies (posted messages). Defendant's Supplemental Answers to Interrogatories, Nos. 41, 42.

**4.** Notwithstanding plaintiff's intimations to the contrary, the record indicates that St. Gabriel's C.Y.O. has never used ISHS facilities, although it has used the facilities of another school within the school district. *See* Plaintiff's Brief at 3; Defendant's Answers to Interrogatories, Attachments.

fy such prior restraints in the school context, plaintiff asserts, the school district must show "substantial facts" that "reasonably support" a forecast of likely disruption from a proposed distribution. In this case, plaintiff argues, his distribution of religious tracts in 1989–90 caused only a few five-minute interruptions of classroom instruction and one student's tardy arrival to class—hardly a substantial basis upon which to forecast disruption from future distributions.[5] Hence, according to plaintiff, the prior restraint provisions must be declared facially invalid.

Although it concedes that plaintiff's distributions are protected speech, the school district counters that ISHS *hallways* are a non-public forum in which no student or community group—not even SADD—has been permitted to distribute. As a consequence, the school district contends, each provision of the new policy, whether content-based or not, need only reasonably relate to the educational purposes that ISHS serves. No provision of the policy fails to satisfy that reasonable relationship test, according to the school district. Even assuming that the hallways are a limited public forum, the school district submits, the content-based exclusion in Schedule A is narrowly tailored to serve two of the district's compelling interests: first, the need to preserve an educational environment at ISHS, which the record reveals has been jeopardized by plaintiff's and Ferry's distributions; and second, the need to avoid creating an impression that the school district endorses religion, which the establishment clause prohibits.

Lastly, the school district argues that its content-neutral time, place, and manner regulations are narrowly tailored to serve the significant ISHS interest in preserving the school's educational environment.

## I. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(c), the court may not grant summary judgment in favor of either party if the record shows the existence of at least one genuine issue of material fact.

■ Asserted disputes of fact are "material" if their resolution could affect the outcome of the case under the applicable substantive law. *See, e.g., Hozier v. Midwest Fasteners, Inc.*, 908 F.2d 1155, 1158 (3d Cir.1990).

The evidentiary analysis under Rule 56(c), on the other hand, is governed by the Supreme Court's trilogy of cases[6] defining the quantum of evidence sufficient to enable a nonmoving party to survive a motion for summary judgment. The trilogy's basic rule is that a motion for summary judgment will not succeed if the dispute about a material fact is "genuine." This standard, which mirrors the standard for directing a verdict, requires inquiry into "whether the evidence presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512; *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir.1990).

■ Although a "scintilla of evidence" supporting the nonmovant's case is not sufficient to defeat a motion for summary judgment, it is clear that a district court should not weigh the evidence, draw inferences from the underlying facts, or make credibility determinations, but instead should determine only whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 252, 255, 106 S.Ct. at 2513; *Country Floors, Inc. v. Gepner*, 930 F.2d 1056 (3d Cir.1991).

Mindful of this procedural standard of review, I turn to determine the substantive

---

**5.** Plaintiff also challenges the time, place, and manner restrictions in Mr. Cianci's handwritten note to the extent that such restrictions constitute a still-effective school district policy. Because the school district has indicated that the new policy supersedes the regulations in the note, the court will forgo an analysis of those regulations.

**6.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

principles of constitutional law that govern this action.

## II. DISCUSSION

The federal appellate courts have not yet addressed the specific question whether secondary school students have a constitutional right to distribute religious literature on school grounds during the school day. *See, e.g., Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1393 (3d Cir.) (Stapleton, J., dissenting), *cert. denied*, —— U.S. ——, 111 S.Ct. 253, 112 L.Ed.2d 211 (1990) ("the question ... is a difficult and close one which this court has not yet resolved"). The court will therefore chart its reasoning with guidance from free speech and establishment clause cases that are apt to assist rather than mislead.

### A. Protected Speech

█ It is axiomatic that written expression is pure speech. *See Texas v. Johnson*, 491 U.S. 397, 406, 109 S.Ct. 2533, 2540, 105 L.Ed.2d 342, 354–55 (1989). It is equally well-settled that the guarantee of freedom of speech that is enshrined in the first amendment[7] encompasses the right to distribute peacefully. *See United States v. Grace*, 461 U.S. 171, 176, 103 S.Ct. 1702, 1706, 75 L.Ed.2d 736, 743 (1983); *Heffron v. International Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563, 69 L.Ed.2d 298, 306 (1981); *Martin v. City of Struthers*, 319 U.S. 141, 143, 63 S.Ct. 862, 863, 87 L.Ed. 1313, 1316–17 (1943); *Murdock v. Pennsylvania*, 319 U.S. 105, 111–12, 63 S.Ct. 870, 874–75, 87 L.Ed. 1292, 1297–98 (1943). In addition, the first amendment protects both political speech, *see, e.g., Bigelow v. Virginia*, 421 U.S. 809, 822, 95 S.Ct. 2222, 2232–33, 44 L.Ed.2d 600, 612 (1975), and religious speech. *Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 274, 70 L.Ed.2d 440, 447 (1981); *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1370 (3d Cir.1990).

### B. Regulation of Protected Student Speech in Public Secondary Schools

█ Students do not shed their right to freedom of expression at the schoolhouse gate. *Tinker v. Des Moines Indep. Community School Dist.*, 393 U.S. 503, 506, 511, 89 S.Ct. 733, 736, 739, 21 L.Ed.2d 731, 737, 740 (1969). Nonetheless, the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings. *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 682, 106 S.Ct. 3159, 3163, 92 L.Ed.2d 549, 558 (1986); *New Jersey v. T.L.O.*, 469 U.S. 325, 348, 105 S.Ct. 733, 746, 83 L.Ed.2d 720, 739 (1985) (Powell, J., concurring).

In determining the scope of students' constitutional rights, courts must weigh the special characteristics inherent in a school environment. *Tinker*, 393 U.S. at 506, 89 S.Ct. at 736, 21 L.Ed.2d at 737. Courts and commentators are divided, however, over whether judicial "forum analysis" should apply to regulations limiting students' personal, protected speech that occurs on school property during school hours.

### 1) Forum Analysis Not Appropriate

In *Tinker*, a high school student and his junior high school sister wore black armbands to their schools in protest of the Vietnam War. The principals of the schools then adopted a policy that any students wearing such armbands would be suspended if they did not remove the armbands when asked to do so. The plaintiffs wore the armbands, refused to remove them, and were suspended.

Reasoning that the students' conduct was symbolic speech protected by the first amendment, the Supreme Court noted the tension between the students' free speech rights and the authority of states and schools to prescribe conduct and otherwise discipline students. *Tinker*, 393 U.S. at 507–09, 89 S.Ct. at 737–38, 21 L.Ed.2d at 738–39.

Without analyzing whether the schools were public or non-public fora, the Court

---

**7.** The first amendment applies to the states through the fourteenth amendment. *Murdock v. Pennsylvania*, 319 U.S. 105, 63 S.Ct. 870, 87 L.Ed. 1292 (1943).

stated that "undifferentiated fear or apprehension of [school] disturbance" is insufficient to overcome students' first amendment rights. *Id.* at 508, 89 S.Ct. at 737, 21 L.Ed.2d at 739. The exercise of those rights, the Court stated, is vital to an integrated educational environment and cannot be limited absent a strong showing of interference with the stability of that environment or with the rights of others:

> The principal use to which the schools are dedicated is to accommodate students *during prescribed hours* for the purpose of certain types of activities. *Among those activities is personal intercommunication among the students....* *[A school] is a public place,* and its dedication to specific uses does not imply that the constitutional rights of persons *entitled to be there* are to be gauged as if the premises were purely *private* property.... [Personal intercommunication among students] is not only an inevitable part of the process of attending school; it is also an *important part of the educational process.* A student's rights, therefore, do not embrace merely the classroom hours. When he is *in the cafeteria,* or on the playing field, *or on the campus during the authorized hours,* he may express his opinions, even on controversial subjects ... *if he does so without "materially and substantially interfering with the requirements of appropriate discipline in the operation of the school" and without colliding with the rights of others.*[8]

*Id.* at 512–13 & n. 6, 89 S.Ct. at 739–40 & n. 6, 21 L.Ed.2d at 741 & n. 6 (emphasis added).

The *Tinker* Court found no evidence that the plaintiffs had materially disrupted classwork, caused substantial disorder, or invaded the rights of other students to be secure and to be let alone. Because the school authorities had no "reason to anticipate" that the wearing of armbands would "substantially interfere" with the work of the school or impinge upon the rights of other students, the schools' policy was

based only on a fear of disturbance and was unconstitutional. *Id.* at 508–09, 513–14, 89 S.Ct. at 737–38, 740, 21 L.Ed.2d at 738–39, 742.

Three years ago, in *Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), the Court undertook a forum analysis when it revisited the issue of student speech in the public secondary schools. In *Kuhlmeier,* however, the school officials assumed an active role in relation to the student speech, unlike the *Tinker* officials whose role was purely passive.

Specifically, *Kuhlmeier* involved a high school principal's deletion of articles about pregnancy and divorce from the school newspaper. The newspaper was produced as part of the school's journalism curriculum. It was the practice at the school for students to write and edit articles. The journalism teacher would then submit the proposed articles to the principal for his review.

The Court reasoned that although public schools are dedicated to accommodate students' *personal* intercommunication, the dedication does not extend to unlimited *school-sponsored* student intercommunication. Stating that a school need not sponsor speech that is inconsistent with its basic educational mission, the Court emphasized that the school newspaper was *"a supervised learning experience* for journalism students" and was, therefore, school-sponsored. *Kuhlmeier,* 484 U.S. 260, 266, 270, 108 S.Ct. 562, 567, 569, 98 L.Ed.2d 592, 602, 605 (1988). The Court then undertook a forum inquiry, concluded that the newspaper was a non-public forum, and held that the school officials had reasonably regulated the contents of the newspaper, thus satisfying the standard of review for state regulation in a non-public forum. *Id.* at 270, 274, 108 S.Ct. at 569, 571–72, 98 L.Ed.2d at 605, 607.

Carefully distinguishing *Tinker,* the Court stated:

---

**8.** For student speech to invade "the rights of others," it must, apparently, be tortious. *See Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 273 n. 5, 289–90, 108 S.Ct. 562, 570 n. 5, 579, 98 L.Ed.2d 592, 606 n. 5, 617 (1988) (Brennan, J., dissenting).

The question whether the First Amendment requires a school *to tolerate* particular student speech—the question that we addressed in *Tinker*—is different from the question whether the First Amendment requires a school *affirmatively to promote* particular student speech. The former question addresses educators' *ability to silence a student's personal expression that happens to occur on the school premises*. The latter question concerns educators' *authority over school-sponsored* publications, theatrical productions, and other *expressive activities that students, parents, and members of the public might reasonably perceive to bear the imprimatur of the school*. These activities may fairly be characterized as part of the school curriculum.... [T]he standard articulated in *Tinker* for determining when a school may *punish* student expression need not also be the standard for determining when a school *may refuse to lend its name and resources to the dissemination of student expression*.

*Id.* at 270–71, 272–73, 108 S.Ct. at 569–70, 98 L.Ed.2d at 605–06 (emphasis added). Thus, *Kuhlmeier* involved the issue of student *access* to state action in a way that *Tinker* did not. *Cf. Board of Educ. of Westside Community Schools v. Mergens,* 495 U.S. ——, ——, 110 S.Ct. 2356, 2372, 110 L.Ed.2d 191, 216 (1990) (noting parenthetically that in *Tinker* there was "no danger that ... students' symbolic speech implied school endorsement").

Several courts and commentators analyzing facts analogous to *Tinker*'s, rather than facts analogous to *Kuhlmeier*'s, have eschewed public forum analysis and have absolutely required all content-based government regulations of protected student speech to be narrowly tailored to a compelling governmental interest. According to those authorities, forum analysis is irrelevant when neither access to public property nor state action is at issue.

Although students' requests to meet in schoolrooms *before* or *after* school hours do present questions of access to public property, *see e.g., Cornelius v. NAACP Legal Defense and Educational Fund, Inc.,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), no access question was involved in *Tinker.* Furthermore, state action was not at issue in *Tinker.* Because *Tinker* merely involved students' *personal expression*[9] *during school hours* in a place where the students were entitled to be, *Tinker* and factually similar cases have nothing to do with a school's status as a public forum.[10]

9. Several cases suggest that students' expression is "personal" if it is voluntary and not dictated by any individual or group. *See, e.g., Mergens,* 495 U.S. at ——, 110 S.Ct. at 2391–92, 110 L.Ed.2d at 240 (Stevens, J., dissenting); *Katz v. McAulay,* 438 F.2d 1058, 1061 (2d Cir.1971); *Hedges v. Wauconda Community Unit School Dist. No. 118,* No. 90 C 6604, 1991 WL 2458, 5, 1990 U.S.Dist. LEXIS 17762, 15–16 (N.D.Ill.).

10. *See Burch v. Barker,* 861 F.2d 1149, 1158–59 (9th Cir.1988) (not engaging in forum analysis, and distinguishing case from *Kuhlmeier*); *Rivera v. East Otero School Dist.,* 721 F.Supp. 1189, 1193 (D.Colo.1989) (stating that "the holding in *Tinker* did not depend on a finding that the school was a public forum," opining that notwithstanding availability of school campus as a public forum to nonstudents, students are required to be there and have first amendment protection while lawfully in attendance, and applying strict scrutiny); Laycock, "Equal Access and Moments of Silence: The Equal Access Status of Religious Speech By Private Speakers," 81 Nw.U.L.Rev. 1, 47–49 (1986) (citizens going about their business in a place they are entitled to be are presumptively entitled to speak, *Tinker*

protects students' rights to speak in halls and on school grounds during *free* time, and such rights were not contingent on school's status as a public forum); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 49 n. 9, 53, 103 S.Ct. 948, 958 n. 9, 959, 74 L.Ed.2d 794, 807 n. 9, 809 (1983) (noting that *Tinker* involved *use* of—rather than *access* to—school property, and stating that "when government property is not dedicated to open communication the government may ... restrict *use to those who participate in the forum's official business*"); *cf. Board of Educ. of Westside Community Schools v. Mergens,* 495 U.S. ——, —— & n. 22, 110 S.Ct. 2356, 2392 & n. 22, 110 L.Ed.2d 191, 240 & n. 22 (1990) (Stevens, J., dissenting) (distinguishing "individual expression of personal conscience" [*Tinker*] from collective statements of a student club "with powers and responsibilities ... that would not exist absent the state's intervention" [*Kuhlmeier,*]); *Roberts v. Madigan,* 921 F.2d 1047, 1056 n. 10, 1057 (10th Cir.1990) (if student's or teacher's speech has no school-sponsorship nexus, the speech may only be regulated if it would "materially and substantially interfere with the requirements of appropriate disci-

Thus, there is well-reasoned authority counselling the court to leapfrog public forum analysis and apply strict scrutiny to the content-based portions of the defendant school district's new policy. Plainly, plaintiff's speech was personal, was not school-sponsored, and occurred during school hours at ISHS. Nonetheless, the Supreme Court's application of forum analysis is ever-expanding, and some courts have applied a public forum analysis to *Tinker* speech. Therefore, the question remains: If a forum analysis is required and if the court performs such an analysis, is strict scrutiny of content-based regulations the appropriate standard of review?

### 2) *ISHS Is A Limited Public Forum*

■ I am satisfied that the answer is yes.

Under judicial forum analysis, limitations that the government lawfully may impose on protected speech vary with the nature of the relevant forum.

■ "Traditional public fora" are defined as places such as streets or parks that "have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Gregoire v. Centennial School Dist.*, 907 F.2d 1366, 1370 (3d Cir.1990) (quoting *Hague v. CIO*, 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). Speakers can be excluded from a traditional public forum only when the exclusion is necessary to serve a compelling state interest and the exclusion is narrowly drawn to achieve that interest. *Cornelius v. NAACP Legal Defense and Educational Fund, Inc.*, 473 U.S. 788, 800, 105 S.Ct. 3439, 3448, 87 L.Ed.2d 567, 578 (1985).

■ A designated public forum is created when the state intentionally opens public property for use by the public at large for assembly and speech, for use by certain speakers, or for the discussion of certain subjects. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580. A state is not required to maintain the open character of the forum. While the forum is open, however, content-based regulation of speech is subject to the same strict scrutiny analysis applied in a traditional public forum. *Gregoire*, 907 F.2d at 1370.

■ A third forum category is the non-public forum. Non-public fora exist when the state does not designate public property for indiscriminate expression by the public at large, by certain speakers, or on certain subjects. Although non-public fora can exist even when public property has been dedicated to use for communicative purposes, the nature of the dedication must be such that the contemplated communication (1) is not indiscriminate on any topic or for any group, or (2) requires some measure of state endorsement or action. *See United States v. Kokinda*, — U.S. —, —, 110 S.Ct. 3115, 3121, 111 L.Ed.2d 571, 583–84 (1990) (not designated public forum where property was expressly dedicated to only one means of communication); *Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592. Absent one of those two limitations, the forum is a designated public forum. Content-based regulation in a non-public forum is examined under the "reasonable nexus" standard. "Control over access to a non-public forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius*, 473 U.S. at 806, 105 S.Ct. at 3451, 87 L.Ed.2d at 582.

Public high schools are not quintessential public fora. At issue, then, is whether ISHS (if it must be analyzed as a forum) fits under the designated public forum category or the non-public forum category.

■ To resolve that issue, the court first looks to two factors that the Supreme Court in *Perry* and *Cornelius* identified as relevant in analyzing whether a particular

---

pline in the operation of the schools"); Note, "Beyond *Mergens:* Balancing a Student's Free Speech Right Against the Establishment Clause in Public High School Equal Access Cases," 32 Wm. & Mary L.Rev. 127, 133–34 (1990) (*Tinker* involved "passive" speech).

forum has been designated as open or closed.[11]

The first factor is governmental intent. A court should evaluate "the *policy and practice* of the government to ascertain whether it intended to designate a place not traditionally open to assembly and debate as a public forum." *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580 (emphasis added). The nature of the property and its compatibility with expressive activity provide additional information bearing on intent. *Id.; Gregoire*, 907 F.2d at 1371.

A second factor relevant to categorizing a forum to which outsiders seek access as open or closed is the extent of use granted. Where access is sought, evidence that the property is open to "all comers" and that access is consistently granted supports a finding that the forum is open. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47, 103 S.Ct. 948, 956, 74 L.Ed.2d 794, 806 (1983); *Gregoire*, 907 F.2d at 1371.

In the course of its definition of designated public fora, the Court in *Perry* noted in dictum that "[a] public forum may be *created* for a *limited purpose* such as *use by certain groups, e.g., Widmar v. Vincent (student groups)*...." *Perry*, 460 U.S. at 45 n. 7, 103 S.Ct. at 955 n. 7, 74 L.Ed.2d at 805 n. 7 (emphasis added). In *Cornelius*, the Court adopted the *Perry* dictum in its definition of the designated public forum. *Cornelius*, 473 U.S. at 802, 105 S.Ct. at 3449, 87 L.Ed.2d at 580 (designated public forum exists when state intentionally opens property for use by certain speakers).

Hence it is true, as some commentators have recognized, that in the wake of *Cornelius* the concept of a "limited public forum" does not exist as an analytically "sep-arate" forum category; nevertheless, the "limited public forum" has retained vitality *within* the designated public forum category, and commentary to the contrary is unpersuasive. *See, e.g.,* Note, 32 Wm. & Mary L.Rev. at 134–35 & n. 72. Supreme Court cases decided since *Cornelius* that have defined the designated public forum category without reference to *Perry*'s footnote seven or to the limited public forum concept are cases to which that concept is irrelevant. The concept is not dead. *Compare United States v. Kokinda*, —— U.S. ——, 110 S.Ct. 3115, 111 L.Ed.2d 571 (1990) (court did not discuss limited public forum because there was no indication that government had created a public forum for the use of the political organization that sought access to sidewalk) *with Widmar v. Vincent*, 454 U.S. 263, 267 & n. 5, 102 S.Ct. 269, 273 & n. 5, 70 L.Ed.2d 440, 446 & n. 5 (1981) (decided before *Perry*, stating that public university had created a limited public forum for use by student groups, and noting that even without the creation of such a forum for those groups the university would be a limited public forum for *individual* students) *and Cornelius*, 473 U.S. at 803, 105 S.Ct. at 3449, 87 L.Ed.2d at 580 ("[In *Widmar* ] we noted that a university campus, *at least as to its students*, possesses many of the characteristics of a traditional public forum").

The court assumes that, because limited public fora fall within the designated public forum category, a limited public forum will not be found to exist at a public high school absent: (1) government intent to create such a forum; or (2) where outsiders seek access to the high school, evidence that wide access to the high school is granted to outsiders.[12]

---

**11.** In defining the forum, the focus should be on the access that the speaker seeks. *See Cornelius,* 473 U.S. at 801, 105 S.Ct. at 3448, 87 L.Ed.2d at 579. Here, plaintiff seeks general access to ISHS. The court finds, therefore, that the forum encompasses all of ISHS, not just its hallways.

**12.** *But see* Laycock, 81 Nw.U.L.Rev. at 49. According to Professor Laycock:

> That the forum is limited to students and faculty *has no relationship in logic or policy to whether* the forum is permanent or revocable, or to whether *the forum exists* by constitutional entitlement or *by the school's volition.* That the limitation to students and faculty should seem to control these other unrelated issues is an arbitrary and unexamined consequence of the three categories in *Cornelius.*
>
> *Id.* (emphasis added).

Judge Stapleton's dissent in *Gregoire* provides guidance on the issue of what constitutes government intent to create a limited public forum for students at a public high school, an issue that the *Gregoire* panel's majority did not address. Inferring from *Perry*'s footnote seven that such intent is to be measured by the property's *dedication,* Judge Stapleton opined that "speakers or topics *within the ambit of the dedication* cannot be excluded without showing a compelling state interest ... until the forum is redefined or terminated." *Gregoire,* 907 F.2d at 1387 n. 3 (Stapleton, J., dissenting).

■ As noted above, the *Tinker* Court reasoned that public schools are dedicated, in part, to accommodate students during prescribed hours for personal intercommunication. Unless the students' speech is curriculum-related, the speech cannot be limited during those hours on the school campus without a strong showing of interference with school activities or with the rights of other students. As the Court stated, *"Dedication to specific uses* [including student interpersonal communication] does not imply that the constitutional rights of persons entitled to be there are to be gauged as if the premises were purely private property." *Tinker,* 393 U.S. at 512 n. 6, 89 S.Ct. at 739–40 n. 6, 21 L.Ed.2d at 741 n. 6 (emphasis added).

■ In the light of *Tinker,* I conclude that government intent to create public secondary schools as limited public fora, during school hours, for the first amendment personal speech of the students who attend those schools, is intrinsic to the dedication of those schools. Only when the schools cease operating is that intent negated. *See Kuhlmeier,* 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (suggesting that, if *Tinker* implicitly depended upon a forum analysis, the forum was public); *Cornelius,* 473 U.S. at 829, 105 S.Ct. at 3463, 87 L.Ed.2d at 598 (Blackmun, J., dissenting) (*Tinker* involved a limited public forum); *Bender v. Williamsport Area School Dist.,* 741 F.2d 538, 547 n. 12 (3d Cir.1984), *vacated on other grounds,* 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986) (high school can

be limited public forum for students); *Hedges v. Wauconda Community Unit School Dist. No. 118,* No. 90 C 6604, 1991 WL 2458, 6, 1990 U.S.Dist. LEXIS 17762, 19 (N.D.Ill.) (junior high school was a limited public forum); *Thompson v. Waynesboro Area School Dist.,* 673 F.Supp. 1379, 1385–87 (M.D.Pa.1987) (junior high school was a limited public forum); *see also Nelson v. Moline School Dist.,* 725 F.Supp. 965, 971–74 (C.D.Ill.1989) (stating that *"Tinker* ['s standard] ... is ... the standard required ... for *content based* restrictions in limited public forums" like high schools, but concluding that school's hallways were non-public forum to the extent the *reasonableness* of school's *content-neutral* time, place, and manner regulations of student speech was at issue); *cf. Heffron v. International Society for Krishna Consciousness, Inc.,* 452 U.S. 640, 655, 101 S.Ct. 2559, 2567, 69 L.Ed.2d 298, 311 (1981) (calling the Minnesota State Fair a limited public forum for fair exhibitors).

Thus, a public forum analysis leads the court back to the strict scrutiny standard of review. Accordingly, the court will examine the defendant school district's content-based regulations of student speech to determine whether the regulations are narrowly tailored to a compelling governmental interest.

## C. Strict Scrutiny

### 1) *Ban on Religious and Political Speech*

■ The school district argues that its concededly content-based ban on "material(s) that proselytizes a *particular* religious or political belief" is narrowly tailored to compelling governmental interests in (1) providing an educational environment at ISHS and (2) in avoiding establishment clause problems. The school district fails to carry its burden on this argument.

Notwithstanding the school district's first asserted interest, a public secondary school environment is not fully "educational" where students' personal intercommunication is restricted to particular issues. Such restrictions stunt the growth of budding citizens and budding minds and are

**294**

invalid absent a legitimate constitutional justification. *See Tinker*, 393 U.S. at 512, 89 S.Ct. at 740, 21 L.Ed.2d at 741 (students' intercommunication is important part of educational process); *Burch v. Barker*, 861 F.2d 1149, 1159 (9th Cir.1988) ("Interstudent communication does not interfere with what the school teaches; it enriches the school environment for the students"); *Rivera v. East Otero School Dist.*, 721 F.Supp. 1189, 1194 (D.Colo.1989) (school policy similar to Interboro's "cripples [students] as contributing citizens" and "defeat[s] the very purpose of public education"). Therefore, to the extent that the ban on religious and political material is defended as necessary to an educational environment at Interboro schools, that defense is categorically rejected.

The school district's primary argument is, then, that a content-neutral policy would require the district to endorse religion in contravention of the establishment clause. Balancing the free speech interest of plaintiff and other ISHS students against the establishment clause interest of the school district, the court concludes that the latter interest is not compelling and does not justify content-based discrimination.

▆▆▆ Applying to the states through the fourteenth amendment,[13] the establishment clause is part of an affirmative defense against a free speech claim, rather than "a limitation on the definition of that right." *Bender v. Williamsport Area School Dist.*, 741 F.2d 538, 558 n. 27 (3d Cir.1984), *vacated on other grounds*, 475 U.S. 534, 106 S.Ct. 1326, 89 L.Ed.2d 501 (1986). The appropriate inquiry for this court is: If the school district were to permit nondiscriminatory distribution of nonschool written materials, including materials that proselytize a particular religion, would there be an establishment of religion?

▆▆▆ Establishment clause questions are governed by the three-pronged test of *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). To pass constitutional muster, a content-neutral policy for the distribution of nonschool written materials would have to satisfy the following: First, it would have to have a secular governmental purpose; second, its principal or primary effect would have to be one that neither advances nor inhibits religion; and third, the policy would have to avoid excessive government entanglement with religion. *Lemon*, 403 U.S. at 612–613, 91 S.Ct. at 2111, 29 L.Ed.2d at 755.

A content-neutral policy would surely satisfy *Lemon*'s first prong. Toleration of *all* protected student written speech would evince a secular purpose and a concern for students' social and intellectual development. Moreover, such a policy would be more consonant than the current policy with the school district's disavowal of any religious purpose. *See, e.g., Mergens*, 495 U.S. at ——, 110 S.Ct. at 2371, 110 L.Ed.2d at 215 (O'Connor, J., plurality) (nondiscriminatory access granted under Equal Access Act evinced secular purpose); *Gregoire*, 907 F.2d at 1380, 1383 (school district's purpose in granting access for meetings to a wide spectrum of groups was secular, and court noted same establishment clause analysis would apply to regulation of the distribution of religious literature); *Rivera*, 721 F.Supp. at 1195.

▆▆▆ The court's analysis under *Lemon*'s second prong is not so facile. To be valid, a policy permitting distributions of nonschool religious literature would *substantively* have to have as its primary *effect* neither government advancement nor government inhibition of religion. *See Bender*, 741 F.2d at 555, 558 (effect must be primary rather than incidental). Because "there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech [Clause] ... protect[s]," *Mergens*, 495 U.S. at ——, 110 S.Ct. at 2372, 110 L.Ed.2d at 216 (O'Connor, J., plurality), the court's focus is perforce on *state action*. A school district's policy cannot be unconstitutional simply because it allows students and churches to advance religion. *See Corporation of the*

---

**13.** *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60    S.Ct. 900, 903, 84 L.Ed. 1213 (1940).

*Presiding Bishop v. Amos,* 483 U.S. 327, 337, 107 S.Ct. 2862, 2869, 97 L.Ed.2d 273, 283 (1987); *Rivera,* 721 F.Supp. at 1195.

Interboro School District contends that a content-neutral policy would cause it actively to endorse religion. In recent establishment clause cases, the Supreme Court has focused its second-prong *Lemon* inquiry on whether a *reasonable observer* would perceive government action to be an endorsement or disapproval of religion. *See, e.g., County of Allegheny v. ACLU,* 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); Note, "The Establishment Clause in Public Schools: A Model for Future Analysis," 79 Georg.L.J. 121, 129–30 (1990). Yet, in cases involving public secondary schools and universities, the Court has stated that the strictness of the application of *Lemon* 's second prong varies with the impressionability of the students at each level of education. *See Widmar,* 454 U.S. at 274 n. 14, 102 S.Ct. at 276–77 n. 14, 70 L.Ed.2d at 450 n. 14.

In *Widmar,* the Court held that a public university's policy granting nondiscriminatory access for student groups to meet on campus did not violate the establishment clause. The Court later stated that *Widmar* stands for the proposition that a university's open forum

> does not "confer any imprimatur of state approval on religious sects or practices." Indeed, the message *is one of neutrality rather than endorsement;* if a State refused to let religious groups use facilities open to others, then it *would demonstrate not neutrality but hostility* toward religion.

*Mergens,* 495 U.S. at ——, 110 S.Ct. at 2371, 110 L.Ed.2d at 214 (citations omitted) (emphasis added). Because they were "less impressionable than younger students," university students, the *Widmar* Court concluded, would be able to appreciate the university's message of neutrality toward religion. *Widmar,* 454 U.S. at 274 n. 14, 102 S.Ct. at 276–77 n. 14, 70 L.Ed.2d at 450 n. 14.

Until *Mergens,* it remained unclear whether the Court would deem secondary school students too impressionable to appreciate as neutral a public secondary school's nondiscriminatory toleration of religious and other speech. But in Part III of the *Mergens* opinion, the plurality extended the logic of *Widmar* to the Equal Access Act—an Act that applies to the nation's public secondary schools. Significantly, the Court stated:

> We think that secondary school students are mature enough and are likely to understand that a school does not endorse or support student speech that it merely permits on a nondiscriminatory basis.... The proposition that schools do not endorse everything they fail to censor is not complicated....
>
> ... [W]e note that the Act expressly limits participation by school officials at meetings of student religious groups ... and that any such meetings must be held during "noninstructional time".... The Act therefore avoids the problems of "the students' *emulation of teachers* as role models" and "mandatory attendance requirements"....
>
> ... To be sure, the possibility of *student peer pressure* remains, but there is little if any risk of official state endorsement or coercion where no formal classroom activities are involved and no school officials actively participate.

*Mergens,* 495 U.S. at ——, 110 S.Ct. at 2372, 110 L.Ed.2d at 216 (O'Connor, J., plurality) (citations omitted) (emphasis added); *accord Gregoire,* 907 F.2d at 1380–81; *see generally Thompson v. Waynesboro Area School Dist.,* 673 F.Supp. 1379, 1390 (M.D.Pa.1987) (there is a "general recognition" that *junior* high school students have the maturity to appreciate that a school's accommodation of a religious organization does not constitute approval of the religion); *Hedges v. Wauconda Community Unit School Dist. No. 118,* 1991 WL 2458, 8–9, 1990 U.S.Dist. LEXIS 17762, 23–27 (N.D.Ill.) (life in junior high school is much more structured than life in high school, and junior high school students are generally less mature and more impressionable than high school students); Note, 32 Wm. & Mary L.Rev. at 154 & n. 233 ("Most scientific evidence suggests that exposure

to a breadth of ideas poses little danger to high school students").

The court concludes, therefore, that if Interboro School District were passively to permit nondiscriminatory distribution of nonschool written materials at ISHS during noninstructional time, the school's students would be mature enough to understand that such a policy would not endorse—but would, rather, be neutral toward—religious literature distributed at the school. The *primary* effect of such a policy would be one that would neither advance nor inhibit religion.

Similar considerations guide the court's analysis under *Lemon*'s third prong, which is aimed at the *procedural* problems that attend government regulation of religious speech. As the Court of Appeals for the Third Circuit stated in *Bender*,

> Government must avoid excessive entanglement with religion where "continuing state surveillance will inevitably be required to ensure that [the] restrictions [of] ... the First Amendment [are] respected." ... The usual setting for an entanglement clause violation is when a state official, in order to avoid giving state aid to religion, must make determinations as to what activity or material is religious in nature, and what is secular, and therefore permissible.

*Bender,* 741 F.2d at 555 (citations omitted).

In this case, it is the school district's current policy that involves excessive government entanglement with religion: School officials are required to screen all nonschool written materials in order to identify and exclude materials that proselytize particular religious beliefs.

Were the school district to adopt a content-neutral distribution policy, the need for such screenings would be eliminated, and the school officials would avoid excessive entanglement. *See Mergens,* 495 U.S. at ——, 110 S.Ct. at 2373, 110 L.Ed.2d at 217 (O'Connor, J., plurality) (stating that a denial of equal access would create greater entanglement problems than equal access, and noting that faculty's custodial oversight of student meetings "merely to ensure order and good behavior" did not im-

permissibly entangle government); *Gregoire,* 907 F.2d at 1381 (prohibiting religious meetings actually exacerbates entanglement); *Rivera,* 721 F.Supp. at 1195–96 (policy of prohibiting distribution of religious literature would cause hopeless entanglement); *Thompson,* 673 F.Supp. at 1392 (neutral supervision of plaintiffs' distribution of religious literature would not cause entanglement problem).

I therefore conclude that the school district has failed to demonstrate the existence of a compelling establishment clause interest for the content-based restriction of written religious literature at ISHS.

Nevertheless, Schedule A of the new policy applies not just to ISHS; it applies district-wide. I am not prepared to declare the ban on political and religious materials facially invalid for the entire district simply because the school district is unable to assert an interest justifying the ban at the high school. *See New York State Club Ass'n v. City of New York,* 487 U.S. 1, 11, 108 S.Ct. 2225, 2233, 101 L.Ed.2d 1, 14 (1988) (plaintiff's facial attack will not succeed unless (1) challenged law could *never* be applied in a valid manner or (2) statute is substantially overbroad). After all, it is possible that the impressionability of students at the school district's elementary schools provides a compelling establishment clause interest for Schedule A's content-based ban on religious materials at those schools. *See, e.g., Hedges,* 1991 WL 2458, 9, 1990 U.S.Dist. LEXIS 17762, 26–27 (in light of impressionability of junior high school students, defendant demonstrated existence of compelling state interest). That issue is not before the court.

Even at the elementary school level, however, the school district's current content-based ban is substantially overbroad. Specifically, establishment clause concerns would not justify prohibiting *all* nonschool written religious material at *any* of the schools in the district. For example, a fifth grade student might want to pass out a leaflet in her own handwriting, stating, "I, Jenny Adams, believe in the God of Islam, won't you?" Although such a leaflet "proselytizes a particular religious be-

lief," no reasonable child or adult could believe that such a student-written leaflet would be promoted or endorsed by the school. *See Hedges,* 1991 WL 2458, 10, 1990 U.S.Dist. LEXIS 17762, 28.

Thus, the prohibition of "[m]aterial[ ] that proselytizes a *particular* religious or political belief" will be declared unconstitutionally overbroad and invalid on its face. Although the school district has a compelling interest in preventing material, substantial interference with the work of the schools and with the rights of other students, that interest is protected under other portions of the new policy, and the blanket ban on religious and political literature is unnecessary.[14]

### 2) *Other Provisions of Schedule A*

■ Plaintiff also challenges as content-based and subject to strict scrutiny the absolute prohibition in paragraphs 2 and 5 of Schedule A of "material[ ] that promotes ... disorder" and "material[ ] that ... invades the rights of others or inhibits the functioning of the school, or advocates interference with the rights of any individual or with the normal operation of the school."

Plainly, *Tinker* permits school officials to punish students for distributing the material that these provisions ban. To be sure, even in a limited public forum, public school officials have a compelling interest in preventing material disruptions of classwork, substantial disorder, and invasion of the rights of others.[15]

■ Nevertheless, where public officials are given the power to deny use of a forum in advance of actual expression, the danger of prior restraints exists. *See Ward v. Rock Against Racism,* 491 U.S. 781, 795 n. 5, 109 S.Ct. 2746, 2756 n. 5, 105 L.Ed.2d 661, 678 n. 5 (1989). Although prior restraints are not unconstitutional *per se,* any system of prior restraint bears a heavy presumption against its constitutional validity. *FW/PBS, Inc. v. Dallas,* 493 U.S. 215, ——, 110 S.Ct. 596, 604, 107 L.Ed.2d 603, 618 (1990).

As noted above, the *Tinker* Court stated that school officials' prior restraints of students' personal expression cannot be based on "undifferentiated fear or apprehension of disturbance." Rather, officials must produce evidence showing that they have "reason to anticipate" that the expression will "substantially interfere with the work of the school or impinge upon the rights of other students."

To the extent that paragraphs 2 and 5 are consistent with the extremely limited instances of prior restraint that the *Tinker* Court contemplated as valid, those prohibitions cannot be declared facially invalid.

■ At issue, then, is whether the prohibitions validly can be applied to plaintiff and other students. Reviewing the summary judgment record, I conclude that there is sufficient evidence for a reasonable factfinder to find that plaintiff and other students "substantially" interfered with the work of the school, and that ISHS officials have "reason to anticipate" that such substantial interference will recur if

---

**14.** The court need not reach the issue whether the ban on religious and political literature is facially invalid because unconstitutionally vague. Were the court required to decide that issue, however, ample authority exists for declaring the ban void for vagueness. *See, e.g., Rivera,* 721 F.Supp. at 1197 ("religion" and "politics" are not self-defining terms, and school officials were improperly given unfettered discretion to define them).

**15.** *Tinker* 393 U.S. at 513, 89 S.Ct. at 740, 21 L.Ed.2d at 741–42; *accord Cornelius,* 473 U.S. at 823 n. 3, 829, 105 S.Ct. at 3460 n. 3, 3463, 87 L.Ed.2d at 594 n. 3, 598 (Blackmun, J., dissenting) (*Tinker* Court did not accept the mere avoidance of controversy as a compelling gov-

ernmental interest but, rather, required a showing of incompatibility between the student speech and the requirements of school discipline); *Widmar,* 454 U.S. at 277, 102 S.Ct. at 278, 70 L.Ed.2d at 452 ("we affirm the continuing validity of cases ... that recognize a university's right to exclude even First Amendment activities that violate reasonable campus rules or substantially interfere with the opportunity of other students to obtain an education"); *Thompson,* 673 F.Supp. at 1392 (noting that the two compelling state interests that *Tinker* recognized as validly supporting content-based regulations are (1) preventing material interference with discipline and (2) protecting students' rights).

the students are permitted to continue their distribution. Given the presence of that genuine issue, the case will proceed to trial—a trial limited to the question whether ISHS officials have reason to anticipate *substantial* interference with work at ISHS. Because there is insufficient evidence in the record that plaintiff and other students who distributed tracts tortiously "impinged upon the rights of other students" at ISHS, no evidence on that discrete issue may be introduced at trial.

Interboro School District's compelling interest in punishing material, substantial interference with work and order at ISHS is otherwise protected under the *post*-distribution manner regulation narrowly tailored to that compelling interest. That regulation provides:

> If the Building Principal determines that ... distribution materially and substantially interferes with the safe and orderly passage of students from the School District's building(s) and/or materially and substantially interferes with the requirements for appropriate discipline in the operation of such building(s), then, in such event, the Building Principal will terminate such distribution by giving written notice to the party making the distribution. The party will then immediately cease such distribution.

New Policy ¶ B.6.

ISHS students were not collectively informed of the new policy until November 1990. Moreover, plaintiff, his friend Keith Ferry, and other students who have distributed tracts have not, since November 1990, received written notice that they have acted in violation of paragraph B.6. As a consequence, the court need not resolve whether the students' past distributions caused substantial, material interference, thereby violating that paragraph. Rather, the students' past actions are relevant only to the issue of prior restraint under Schedule A, paragraphs 2 and 5.

## D. Content–Neutral Regulations

The court now turns to examine the challenged content-neutral regulations in the new policy.

### 1) *Prior Restraints*

■■■ Parts A and B of the new policy provide: in paragraph A.1, that a party desiring to distribute nonschool written materials must present a sample to the building principal three days before the day of proposed distribution; in paragraphs A.2 and A.3, that the building principal or his nominee is then to review the material and approve it in writing unless subject to the ban in Schedule A; and in paragraph B.1, that once the distribution is approved, the party must advise the principal of the days of distribution.

To be sure, these paragraphs form a system of prior restraint on students' protected, personal first amendment speech.

Supreme Court cases addressing prior restraints have identified two evils that will not be tolerated in prior restraint regulations.

First, a regulation that places "unbridled discretion" in the hands of a government official constitutes a prior restraint and may result in censorship. *See FW/PBS, Inc.*, 493 U.S. at ——, 110 S.Ct. at 605, 107 L.Ed.2d at 616, 618 (cases collected); *Rock Against Racism*, 491 U.S. at 793, 109 S.Ct. at 2755, 105 L.Ed.2d at 677 (where official is vested with unbridled discretion, facial challenge to regulation is permitted).

Second, a prior restraint that fails to place limits on the time within which the official must decide whether proposed speech will be allowed is impermissible. *See FW/PBS, Inc.*, 493 U.S. at —— – ——, 110 S.Ct. at 605–607, 107 L.Ed.2d at 618–620 (must be adequate procedural safeguards); *Freedman v. Maryland*, 380 U.S. 51, 56–60, 85 S.Ct. 734, 737–740, 13 L.Ed.2d 649, 653–655 (1965). In *Freedman*, the Court held that the failure to place limitations on the time within which a censorship board licensor must make a determination of obscenity is a species of unbridled discretion. The Court ruled that the licensor had to make a decision whether to issue a license within a specified and reasonable time period. Moreover, there had to be the possibility of prompt judicial review in the event that the license was erroneously de-

nied. *Freedman*, 380 U.S. at 58, 85 S.Ct. at 738–39, 13 L.Ed.2d at 654.

Parts A and B incorporate both of the evils that doom prior restraints under the first amendment. Not only do those sections of the policy give school officials unbridled discretion to suppress protected speech in advance, but also they impose no time limits or other procedural obligations on school officials to ensure that speech is suppressed only briefly and for significant reasons, rather than arbitrarily.[16] Consequently, the court will declare paragraphs A.1, A.2, A.3, and B.1 of the new policy facially invalid. *See Burch v. Barker*, 861 F.2d 1149, 1152–59 (9th Cir.1988); *Rivera*, 721 F.Supp. at 1198.

### 2) *Time, Place, and Manner Regulations*

■ In a limited public forum, government may enforce "reasonable" content-neutral time, place, and manner regulations. *See, e.g., Widmar*, 454 U.S. at 276 & n. 19, 102 S.Ct. at 278 & n. 19, 70 L.Ed.2d at 451 & n. 19. To be "reasonable," such regulations must be "narrowly tailored" to serve a "significant" government interest, and they must leave open ample alternative channels of communication. *See, e.g., Heffron*, 452 U.S. at 647–48, 101 S.Ct. at 2564, 69 L.Ed.2d at 306; *Gregoire*, 907 F.2d at 1382 (quoting *Perry*, 460 U.S. at 45, 103 S.Ct. at 954).

Ensuring the safety of persons on public property and preventing the disruption of education at public schools are significant government interests. *See, e.g., Heffron*, 452 U.S. at 650–51, 101 S.Ct. at 2565, 69 L.Ed.2d at 308; *Widmar*, 454 U.S. at 276 n. 19, 102 S.Ct. at 278 n. 19, 70 L.Ed.2d at 451 n. 19 (court is to judge reasonableness of regulations in the light of "the nature of a place [and] the patterns of its normal activities"); *Nelson*, 725 F.Supp. at 972 (same); *Thompson*, 673 F.Supp. at 1391.

The requirement of narrow tailoring is satisfied:

so long as the ... regulation promotes a substantial government interest that

would be achieved less effectively absent the regulation.... So long as the means chosen are not substantially broader than necessary to achieve the government's interest ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

*Rock Against Racism*, 491 U.S. at 799–800, 109 S.Ct. at 2758, 105 L.Ed.2d at 680–81 (citations omitted); *see also* Williams, "Content Discrimination and the First Amendment," 139 U.Pa.L.Rev. 615, 643–44 (1991).

■ Under paragraphs B.2, B.3, B.4, and B.5 of the new policy, approved distributions are to be made on as many days as desired, but only at the end of the school day, only at the school's exit doors, and only in a nondisruptive manner.

Granted, the school district has a significant interest in safety and discipline at ISHS. That interest may well justify prohibition of distributions in the school's hallways and classrooms. But there is no apparent reason for restricting distributions at the exit doors immediately *before* school, or at tables near the cafeteria during lunchtime. Indeed, school groups like SADD have distributed materials in the cafeteria area for years, apparently without incident. Hence, paragraphs B.2, B.3, B.4, and B.5 are unconstitutionally overbroad and will be declared facially invalid. *See Nelson*, 725 F.Supp. 965 (time, place, and manner regulations permitted distribution of non-school materials at exits and entrances, before and after school, and at a place near cafeteria during lunchtime); *Hedges*, 1991 WL 2458, 1990 U.S.Dist. LEXIS 17762 (regulations allowed distributions at junior high school before and after school).

Finally, to the extent that the portion of the policy involving sanctions is applied in accordance with the order that follows, that portion of the policy is constitutionally valid.

---

16. No more than a few hours should be necessary to review student materials. Moreover, any advance review by school officials should be subject to prompt review procedures, with the burden on the officials to convince the reviewing tribunal that the speech is unlawful.

## III. CONCLUSION

Therefore, for the reasons stated above, paragraph 3 of Schedule A, which prohibits distributions of religious and political literature, will be declared overbroad and facially invalid. Paragraphs A.1, A.2, A.3, and B.1 of the new policy, which constitute a system of prior restraint, will be declared facially invalid. In addition, paragraphs B.2, B.3, B.4, and B.5 will be declared overbroad and facially invalid. The case will proceed to trial on the limited question whether ISHS officials have reason to anticipate substantial interference with work at the high school should distributions of religious tracts continue at exit doors before and after school and in the cafeteria area at lunchtime. An appropriate order follows.

## APPENDIX

### INTERBORO SCHOOL DISTRICT

PROCEDURE FOR DISTRIBUTION OF NON–SCHOOL WRITTEN MATERIALS

The purpose of this procedure is to reasonably regulate the distribution of non-school written material(s) within the facilities of the Interboro School District.

In circumstances where written material(s) are sought to be distributed as part of the curricular or extracurricular programs of the Interboro School District, the distribution of such material(s) shall be regulated by the School District as part of the educational programs therein. All other written material(s) sought to be distributed within School District facilities shall be considered to be non-school written material(s) for which this procedure has been designed. In that the Interboro School District considers that its facilities are a non-public forum, the following procedure shall regulate the distribution of non-school written material(s) therein.

A. *Approval for Distribution.*

1. At least three (3) school days prior to the school day proposed for distribution of non-school written material(s), the party desiring to distribute such material(s) shall contact the Building Principal for such purpose and shall present a sample of the non-school written material(s) sought to be distributed.

2. Upon the Building Principal having received a sample of such non-school written material(s) sought for distribution, the Building Principal, or his/her nominee, shall review such written material(s) for purposes of approving the material(s) for distribution.

3. Unless the Building Principal or his/her nominee determines that the written material(s) falls within one of the prohibited categories as set forth in the criteria attached as Schedule "A" to this procedure, such material(s) shall be approved in writing for distribution.

B. *Time, Place and Manner of Distribution.*

1. Upon a party receiving approval from the Building Principal to make distribution of the approved non-school written material(s), the party shall advise the Building Principal of the day(s) during which such distribution shall be made.

2. On the day(s) that distribution of the written material(s) shall occur, the distribution shall be made at the time of normal dismissal of the students from the building(s) where the distribution is to occur.

3. The distribution of the written material(s) shall occur inside or outside the exit doors of the building(s) at the election of the party making the distribution.

4. In the absence of anything hereafter, the party may make the distribution of approved non-school written material(s) as many school days as the party elects in accordance with the time, place and manner as required by this procedure.

5. The distribution of the written material(s) shall be made in a peaceful and non-argumentative manner. The party making the distribution shall insure that no littering of the written materi-

al(s) occurs in or upon the School District's facilities.

6. If the Building Principal determines that such distribution materially and substantially interferes with the safe and orderly passage of students from the School District's building(s) and/or materially and substantially interferes with the requirements for appropriate discipline in the operation of such building(s), then, in such event, the Building Principal will terminate such distribution by giving written notice to the party making the distribution. The party will then immediately cease such distribution.

C. *Sanctions/Penalties.*

1. If the party making the written distribution commits a violation of any of the provisions of this procedure as set forth above, the Building Principal will issue a written notice of such violation to the party and which the party will be required to sign acknowledging receipt of notice of such violation with the intention that the party will discontinue such violation.

2. If the party making the written distribution commits a second violation of any of the provisions of this procedure as set forth above, the Building Principal will issue a second written notice to the party which the party will be required to sign acknowledging receipt of notice of such violation whereupon the party making the distribution and the material(s) sought to be distributed shall be prohibited from further distribution in or upon School District facilities for the remainder of the school year.

3. If a party making distribution of the written material(s) commits a third violation of the procedures herein, the party committing such violation shall be prosecuted by the School District for criminal trespass.

## UNACCEPTABLE NON–SCHOOL WRITTEN MATERIALS FOR DISTRIBUTION IN THE INTERBORO SCHOOL DISTRICT

The Interboro School District has determined that the following shall be considered unacceptable non-school written material(s) for distribution in and upon the facilities of the Interboro School District:

1. So-called "hate" literature that scurrilously attacks any ethnic, religious or racial group(s).

2. Material(s) that promotes hostility, disorder, violence or the commission of a crime.

3. Material(s) that proselytizes a *particular* religious or political belief.

4. Material(s) designed for commercial purposes—advertising a product or service for sale, rent or lease.

5. Material(s) that is libelous, invades the rights of others or inhibits the functioning of the school, or advocates interference with the rights of any individual or with the normal operation of the school.

6. Material(s) which in any way promotes, favors or opposes the candidacy of any candidate for election, or the adoption of any bond issue proposal, or any public question submitted at any general, municipal or school election. The distribution and prohibition of written political material(s) will not apply to any election day or special election when the school is being used as a polling place.

7. Material(s) that is obscene or pornographic as defined by pervading community standards throughout the School District.

### ORDER

AND NOW, this 13th day of May, 1991, upon consideration of the cross-motions for summary judgment filed in this matter, after oral argument, and for the reasons set forth in the foregoing memorandum, it is ORDERED that:

302

1. The motion of plaintiff Scott Slotterback for summary judgment is GRANTED IN PART and DENIED IN PART.

2. The motion of defendant Interboro School District is GRANTED IN PART and DENIED IN PART.

3. Paragraph 3 of Schedule A is DECLARED overbroad and facially invalid.

4. Paragraphs A.1, A.2, A.3, and B.1 of the new policy are DECLARED facially invalid.

5. Paragraphs B.2, B.3, B.4, and B.5 are declared overbroad and facially invalid.

6. The case will proceed to trial on the question whether ISHS officials have reason to anticipate substantial interference with work at the high school should distributions of religious tracts continue at exit doors before and after school and in the cafeteria area at lunchtime.